THOMAS LEE STEAGALL, Respondent and Plaintiff,

*v.*

DOT MANUFACTURING CORPORATION, Petitioner and
Defendant.

446 S.W.2d 515.

(*Nashville,* December Term, 1968.)

Opinion filed October 24, 1969.

C. H. Rutherford, Jr., and James P. Guenther, Nashville, for respondent-plaintiff.

Branstetter, Moody & Kilgore, Nashville, for petitioner-defendant, W. A. Moody, Nashville, of counsel.

Mr. Justice Humphreys delivered the opinion of the Court.

Plaintiff, Thomas Lee Steagall, a cook employed by American Baptist Theological Seminary to prepare meals for the school cafeteria, suffered severe burns to the upper portions of his body when he accidentally turned over a bottle of drain solvent which had been left uncapped on an upper shelf. Plaintiff was reaching for a can of vegetables when he accidentally turned the bottle over, spilling a part of its contents over the upper part of his body.

Plaintiff sued Dot Manufacturing Corporation, from whom the liquid drain solvent had been purchased, alleging common law negligence in the first count of his declaration in that the drain solvent was sulphuric acid, that defendant had failed to provide a safe container in which to sell it, and that the label did not adequately warn of the highly corrosive nature of the bottle's contents. By a second count, defendant was charged with negligence

for violating the Federal Hazardous Substances Labeling Act by omitting from the label the signal word "danger".[1]

The case was tried on the general issue. During the course of instructing the jury, the trial judge charged that the federal statute did not apply, because the insti-

---

[1] "[1261] (f) the term 'hazardous substance' means:
1. (A) Any substance or mixture of substances which (i) is toxic, (ii) is corrosive, (iii) is an irritant, (iv) is a strong sensitizer, (v) is flammable, or (vi) generates pressure through decomposition, heat, or other means, if such substance or mixture of substances may cause substantial personal injury or substantial illness during or as a proximate result of any customary or reasonably foreseeable handling or use, including reasonably foreseeable ingestion by children."
\* \* \* \* \* \*
"[1261] (i) The term 'corrosive' means any substance which in contact with living tissue will cause destruction of tissue by chemical action; but shall not refer to action on inanimate surfaces."
\* \* \* \* \* \*
"[1261] (p) The term 'misbranded hazardous substance' means a hazardous substance (including a toy, or other article intended for use by children, which is a hazardous substance, or which bears or contains a hazardous substance in such manner as to be susceptible of access by a child to whom such toy or other article is entrusted) intended, or packaged in a form suitable, for use in the household or by children, which substance, except as otherwise provided by or pursuant to section 3 [sec. 1262 of this title], fails to bear a label—
(1) which states conspicuously (A) the name and place of business of the manufacturer, packer, distributor or seller; (B) the common or usual name or the chemical name (if there be no common or usual name) of the hazardous substance or of each component which contributes substantially to its hazard, unless the Secretary by regulation permits or requires the use of a recognized generic name; (C) the signal word 'DANGER' on substances which are extremely flammable, corrosive, or highly toxic; (D) the signal word 'WARNING' or 'CAUTION' on all other hazardous substances."
"1263. *Prohibited acts.*—The following acts and the causing thereof are hereby prohibited:
(a) The introduction or delivery for introduction into interstate commerce of any misbranded hazardous substance or banned hazardous substance.
(b) The alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the label of, or the doing of any other act with respect to, a hazardous substance, if such act is done while the substance is in interstate commerce, or while the substance is held for sale (whether or not the first sale) after shipment in interstate commerce, and results in the hazardous substance being a misbranded hazardous substance or banned hazardous substance.
(c) The receipt in interstate commerce of any misbranded hazardous substance or banned hazardous substance and the delivery or proffered delivery thereof for pay or otherwise." (Title 15, Section 1261 et seq. Federal Code Annotated [15 U.S.C.A. sec. 1261 eq seq. ]).

tution to which it had been sold should not be "equated to a household", and so withdrew this count from the jury. On the common law count, the jury found in favor of Dot.

On appeal, the Court of Appeals, Middle Division, declined to read the first count of the declaration as invoking the doctrine of strict liability, a conclusion with which we are in accord, but reversed as to this count on an error in the charge. As to the second count, the Appeals Court held that the federal statute did apply, and that its violation by the omission of the word "danger" from the label on the bottle of sulphuric acid was negligence per se which required reversal and remand for trial on that count.

We granted certiorari, because in our opinion there was no reversible error in the charge on the first count, and, assuming that the violation of a federal statute designed to secure the safety of the individual may be negligence per se, *Myrtle Point Transp. Co. v. Port of Coquille*, 86 Or. 311, 168 P. 625 (1917); *Caldwell v. New Jersey Steamboat Co.*, 47 N.Y. 282 (1872); 2 Restatement of Torts 2d, sec. 285-288, (but not so deciding as this is unnecessary) still, Steagall cannot recover as there is no causal connection between the violation of this statute and his injuries.

Plaintiff Steagall was forty-six years old at the time of the accident. He lacked one year of graduating from high school, and his testimony shows him to be smart and quick to understand. He was experienced in his work, having cooked for approximately seventeen years at a fraternity house, for a period of time for the State of Tennessee School for the Blind, and when injured had been a cook for some period of time at the American

Baptist Theological Seminary. Here he was the head cook in complete charge of the operation of the kitchen. His helpers and aides were students at the Seminary, who worked under his orders and direction. These numbered between ten and eleven. There were no outside workers employed in the kitchen. Plaintiff Steagall attended to ordering the kitchen needs and supplies, together with a Mr. Trammell. However, Steagall personally ordered the drain cleaner here involved from a salesman for the Dot Manufacturing Co. This chemical came in cardboard cartons which contained twelve plastic quart bottles with screw caps. Before plaintiff went to work at the Seminary a different drain solvent was used, the drain solvent sold by Dot being first ordered from that company by plaintiff after he went to work there. The first order Steagall placed was with a man named Starr, representing Dot, who called on Steagall at the Seminary kitchen. Starr demonstrated the proper use of the drain solvent, and told Steagall that if he got any of it on his hands, to wash it off. Steagall knew caution had to be exercised in handling and using the solvent, otherwise skin burns could be inflicted. During the course of the demonstration, Starr showed the student helpers how to use the chemical, so that they could learn how to use it. Steagall did not use the chemical himself, delegating this to the students, after warning them of the danger. The testimony in this regard is as follows:

"Q. You knew you had to exercise caution in the use of it?

A. I never did use it.

Q. But you knew that you should exercise caution in the use of it?

A. Yes, I told them, be careful; 'always be careful'.

Q. Why did you tell them 'always be careful'?

A. Because the man explained it to them that it would burn.

Q. And you knew it would burn them?

A. Yes, sir, I knew it would burn the hand if you got it on the hand. 'Always wash your hands' that's what Mr. Starr said.''

Plaintiff Steagall also instructed his student helpers to keep the drain solvent on the floor, because he noticed when one carton of the chemical was delivered, that the bottom had been attacked by the chemical so that it came out when one of the students lifted the box.

The testimony with respect to the labeling of the bottle was this:

''Q. Mr. Steagall, this bottle carries a label which I will read, and you correct me if I read anything on here which is not correct.

A. Go ahead.

Q. 'Net contents one U. S. quart. Star liquid Drain Solvent. Opens up clogged drains. Turns solid masses into free flowing liquids. Liquifies grease, sanitary napkins, hair, paper, other organic obstructions.' Then it says, 'Poison,' and it has a skull and cross bones, with the word 'Poison' under it.

A. That's right.

Q. 'Contains sulphuric acid. Do not mix with any other compound. Can cause severe burns. Read complete directions on back panel. Keep out of reach of children. An exclusive product of the

Dot Manufacturing Corporation, 410 Lea Avenue, Nashville, Tennessee.' Then there is further material on the back of the label, on the back of the carton, which starts off, 'Poison. Contains sulphuric acid. Avoid contact with skin, eyes or clothing.' And then it gives an antidote.

I want to make certain that we understand this antidote. It says on here: 'External—flood with water immediately. Then cover with moistened sodium bicarbonate. Eyes—flood with water for at least fifteen minutes. Internal—give mild solution of bicarbonate of soda, milk of magnesia, or whites of eggs beaten with water.'

MR. GUENTHER: I think the rest of the Exhibit, your Honor, will speak for itself, and at this point there is no need to go into it.''

Steagall also testified that he didn't know who left the bottle uncapped, but it was probably someone who worked in the kitchen. In this connection it should be mentioned there is no evidence that anyone other than Steagall and the helpers had access to the storeroom where the acid was kept, or ever used the acid.

Steagall received his acid burns when he went into a darkened storeroom and reached to an upper shelf to take down a can of vegetables to be used in a dish he was preparing for lunch. He had arranged the storeroom so that he knew where the different items were on the shelves, and on this occasion he reached up for a can of the vegetables and in the course of so doing knocked over an uncapped bottle of the acid which was on the upper shelf. The acid spilled over him, burning him severely.

There was no explanation as to how the bottle got on the shelf, or why it was left uncapped other than Stea-

gall's testimony it was probably left there by one of his helpers. One student helper was introduced as a witness, who testified that he had not placed it there nor did he know who had and that Steagall had not questioned his aides to find who had.

The particular bottle and its top were introduced in evidence, and were in good order.

■ It is the settled rule in Tennessee that, even though the negligence charged is the violation of a statute or ordinance, and so would be negligence per se, no liability attaches unless it appears that there was a causal connection between this negligence and the injury, and that such negligence was the proximate cause of the injury. *Biggert v. Memphis Power & Light Co.,* 168 Tenn. 638, 80 S.W.2d 90 (1935); *American Natl Bank v. Wolfe,* 22 Tenn.App. 642, 125 S.W.2d 193 (1939); *English v. George Cole Motor Co.,* 21 Tenn.App. 408, 111 S.W.2d 386 (1937); *Brown v. Brown,* 16 Tenn.App. 230, 64 S.W.2d 59 (1933); *Little v. Nashville, C & St.L. Ry. Co.,* 39 Tenn.App. 130, 281 S.W.2d 284 (1954); *Green v. Crescent Amusement Co.,* 32 Tenn.App. 554, 223 S.W.2d 201 (1949).

■ Likewise, it is the settled rule that where a new, independent, and unexpected factor intervenes which was the natural and real occasion of the injury, the necessary causal connection between the act of the defendant and the injury of the plaintiff would be broken, and there could be no recovery. *Smith v. Henson,* 214 Tenn. 541, 381 S.W.2d 892 (1964); *Ford Motor Co. v. Wagoner,* 183 Tenn. 392, 192 S.W.2d 840, 164 A.L.R. 364 (1946).

*Ford Motor Co. et al. v. Wagoner,* supra, is conclusive against a recovery on the statutory count. Ford sold a

motor car with a defective hood latch, but informed the dealer who bought it of the defect. The dealer then sold the car without repairing it or warning of the defect. In holding the act of the dealer was an intervening cause the Court said:

"(1) In Beven on Negligence, a leading text book on this subject, recognized as a classic, in the chapter dealing with 'Limits of Liability' (Volume 1, Fourth Ed., pp. 42, 44), and discussing legal obligation to successive vendees of a compounder of drugs, or manufacturer of articles, for sale to the public, dangerous to health, or in their use otherwise, thus lays down a generally recognized limitation upon liability saying (p. 42): 'A person who *knowing the perilous character* of a compound [equally applicable, clearly, to other instrumentalities fraught with danger] which he has bought, yet hands on the compound to a third person, *destroys, by his negligent act, the causal connection between the first person concerned and the ultimate injury sustained.*'

"(2) And, again on p. 44, it is said:

'The principle that to fix liability for injuries brought about through a complicated state of facts, the last conscious agency must be sought; and the consideration that if, between the agency setting at work the mischief and the actual mischief done, there intervenes a conscious agency, which might or should have averted mischief, the original wrongdoer ceases to be liable, afford the clues for the unravelling of the cases.''

\* \* \* \* \* \*

"The rule thus stated is so obviously well founded in principle and reason that it is not necessary to

lengthen this opinion by extended references to other authorities. However, holdings of this Court are in accord. In the recent case of *Stafford v. Consolidated Bus Lines*, 179 Tenn. 185, 164 S.W.2d 15, Mr. Justice McKinney reviewed our cases, including *Moody v. Gulf Refining Co.*, 142 Tenn. 280, 218 S.W. 817, 8 A.L.R. 1243, and approved recognition therein of the acquitting effect of an independent intervening cause upon the liability of the original wrongdoer.'' 183 Tenn. 397-399, 192 S.W.2d 842-843.

In *Ford Motor*, a statement in 38 Am.Jur. Negligence, is quoted with approval as follows:

''So, in 38 Am.Jur. at page 729, 730, it is said that, 'it can be stated as a general rule that ordinarily the intervention of a negligent act as the independent and efficient cause of an injury operates to relieve one who has been guilty of prior negligence from responsibility for the injury.' Elsewhere this authority notes the conditions upon this general rule, (1) that the intervening actor shall be a conscious agency and (2) that his conduct could not have been reasonably anticipated. Discussing this phase of the question, this text reads (p. 731): 'One who acts negligently is not bound necessarily to anticipate that another person will be negligent after the latter has discovered the danger arising from the former's negligence. The first actor, however, is not permitted to assume that the second actor will discover the danger caused by the first actor's negligence. Accordingly, where the second actor, after having become aware of the existence of a potential danger created by the negligence of the first actor, acts negligently in respect of the dangerous situation and thereby brings about an accident with injurious conse-

quences to others, the first actor is relieved of liability, because the condition created by him was merely a circumstance and not the proximate cause of the accident.' ". 183 Tenn. 400-401, 192 S.W.2d 843-844.

■ These rules prevent a recovery by plaintiff. The uncontradicted evidence, all of it being the plaintiff's own evidence, clearly shows that plaintiff was fully advised as to the dangerously corrosive nature of the drain solvent; that with this knowledge he turned over the solvent and its use to his kitchen helpers, who were likewise aware of the dangers connected with its use, having been instructed in regard thereto by defendant, and told it was dangerous and to be kept on the floor by plaintiff; and thereafter one of these helpers or aides negligently left the bottle uncapped on an upper shelf in a dark storeroom where it could be turned over by one reaching up there for supplies.

These facts bring into operation the intervening cause rule as discussed in the cases to which we have referred, and exclude the operation of any of the qualifications of this rule discussed therein.

And this result would follow even in the absence of knowledge by the aides. For, when Steagall was as fully warned of the danger involved in the use of the solvent as he would have been had the word "Danger" been printed on the label, he then became responsible for its disposition and use, and so responsible for the manner of its handling by his helpers. If they were not fully warned, that was as much Steagall's fault as Dot's. And, if they knew of the danger as the record indicates, the fault is one more time removed from Dot.

■ This case was reversed and remanded by the Court of Appeals for retrial of the common law count, because

in the course of instructing the jury in regard to this count the trial judge charged the jury as follows:

"A duty to warn may arise under the negligent (sic) principles that I have talked about already. In the negligence area, the factors of special importance in determining the existence of a duty to warn are, first, how likely is an accident to occur when the product is put to more or less expected use? Second, if an accident does occur, how serious an injury is likely to result? and third, how feasible is it to give an effective warning without, placing an undue burden on the manufacturers or sellers of the product? There is no duty to warn of dangers that are obvious, such as the fact that a sharp knife will cut or that fresh meat will spoil if not properly packed and cared for. In this particular case the Supreme Court of our state noted that it is not easy to determine from every case whether a particular risk is obvious, but you still have the task of determining it. It is noted in regard to that the decision of a nine-judge court that went five to four."

The Court of Appeals found that the reference in the instruction to a decision of a nine-judge court that "went five to four", was a criticism of the law the court was giving in charge to the jury, which prevented its proper application by the jury and was prejudicial error. 88 C.J.S. Trial sec. 371, p. 951.

In addition to the part of the charge above quoted, and in connection therewith, the trial judge continued in his instructions as follows:

"Your duty is to examine this label and determine whether it has satisfied the requirements of reasonable care in notifying the users of this product as to its

dangers. Also, you are to consider, in addition to what the label contains, what warnings the seller personally gave to the purchaser and to those who used it.''

When this instruction is considered in its entirety, it is evident that the reference to a decision of a nine-judge court that went five to four, was by way of illustrating the difficulty of determining *as a matter of fact* whether a particular risk is or is not obvious.

The whole charge on this point consists of (1) an instruction to the jury that a duty to warn may arise under principles of negligence already given in charge. (2) That there is no duty to warn of dangers that are obvious, but that it is. not easy to determine in every case whether a particular risk is obvious. (3) And that it was the duty of the jury to examine the label and determine whether it satisfied the requirements of reasonable care in notifying the users of the product as to its dangers.

In this, there is no criticism, express or implied, of the proposition that failure to warn of dangers not obvious may constitute negligence, which was the rule of law being discussed at that point.

We find the judgment of the trial court to be in accord with the uncontradicted, plain facts and the law, so the Appeals Court judgment is set aside and the judgment of the Circuit Court, dismissing plaintiff's suit, is affirmed.

BURNETT, CHIEF JUSTICE, and DYER, CHATTIN, and CRESON, JUSTICES, concur.