884 F.2d 1393
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Candace R. SILVER, as next of friend of John Listenbury
Silver, a minor, Plaintiff-Appellant,
v.
NATIONAL PRESTO INDUSTRIES, INC., Defendant-Appellee.
 No. 88-6305.
 United States Court of Appeals, Sixth Circuit.
 Sept. 15, 1989.
 
 Before RALPH B. GUY, Jr., BOGGS and ALAN E. NORRIS, Circuit Judges.
 PER CURIAM.
 
 
 1
 In this products liability action arising out of injuries sustained by her son John, plaintiff Candace R. Silver, as his next friend, appeals the district court's grant of a directed verdict for defendant, National Presto Industries (NPI). Silver claims that her proofs raised a jury question as to whether NPI's portable fryer was marketed in an unreasonably dangerous or defective condition, and whether NPI's violation of the Consumer Product Safety Act established NPI's negligence per se. Finally, Silver claims that she raised a jury question as to whether NPI was negligent in failing to establish a corporate safety policy to identify and correct product hazards. We conclude that the district court properly granted a directed verdict for NPI and, therefore, affirm.
 
 
 2
 On July 26, 1985, Candace Silver was in her kitchen preparing dinner and washing dishes. At that time, she was frying potatoes in a portable deep fat fryer (Fry Daddy) manufactured by NPI. The fryer is shaped like a sand bucket and heats up to four cups of oil to a temperature up to 415 degrees Fahrenheit. The Fry Daddy used by Mrs. Silver had hard plastic "feet" and no cover to enclose the cooking compartment.[1] While Mrs. Silver's back was momentarily turned, her then thirteen-month old son John somehow caused the Fry Daddy to slide across the formica counter and topple over, spilling very hot oil on him.[2] As a result of his injuries, John is now a spastic quadriplegic who suffers from, among other things, blindness, seizures, scarring, chronic scalp infection, and mental retardation.
 
 
 3
 Mrs. Silver filed a products liability action against NPI based on negligence, alleging that the Fry Daddy was unreasonably dangerous and defective. She claimed that NPI should have affixed to the fryer's cord further warnings about the product's dangers, included a locking lid to enclose the fryer, disclosed other similar accidents to the Consumer Product Safety Commission, and employed a corporate safety policy. The district court determined that the product was not defective or unreasonably dangerous and that the absence of further safety features and warnings did not proximately cause the injuries in question. Therefore, the court granted NPI's motion for a directed verdict.
 
 I.
 
 4
 As an initial matter, this court follows the minority view that "[a] federal court sitting in a diversity case must apply the directed verdict standard of the state whose substantive law governs the particular cause of action." Fitzgerald v. Great Cent. Ins. Co., 842 F.2d 157, 159 (6th Cir.1988) (citation omitted); Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable & Cold Storage Co., 702 F.2d 427, 430 n. 3 (6th Cir.1983). In Tennessee, upon a defendant's motion for a directed verdict, "the Court must take the strongest legitimate view of the evidence in favor of plaintiff, allow all reasonable inferences in plaintiff's favor, discard all countervailing evidence and deny the motion, unless the minds of reasonable men could draw only one conclusion and that favorable to defendant." Gann v. Int'l Harvester Co., 712 S.W.2d 100, 105 (Tenn.1986). A directed verdict for a defendant is appropriate in products liability cases when there is a failure of proof with respect to proximate cause, Cansler v. Grove Mfg. Co., 826 F.2d 1507 (6th Cir.1987), cert. denied, 108 S.Ct. 1227 (1988), or with respect to whether a product is defective or unreasonably dangerous. Kerley v. Stanley Works, 553 S.W.2d 80 (Tenn.App.1977).
 
 
 5
 We first consider whether the district court properly determined that there was no evidence from which a jury reasonably could conclude that the Fry Daddy was defective or unreasonably dangerous. The Tennessee Products Liability Act (the Act), Tenn.Code Ann. Sec. 29-28-101, et seq., governs all products liability actions whether grounded in negligence, strict liability, or breach of warranty, etc.[3] Section 29-28-105(a) of the Act imposes product liability on a manufacturer or a seller only when the product in question is determined to be in a defective condition or unreasonably dangerous when it left the manufacturer's control.[4] Subsection (d) makes explicit that, when a product's danger is obvious to the ordinary user, the failure to warn consumers adequately of that danger does not render the product unreasonably dangerous.
 
 
 6
 The Act defines defective condition as "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Tenn.Code Ann. Sec. 29-28-102(2). An unreasonably dangerous product is defined as one that is
 
 
 7
 dangerous to an extent beyond which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller assuming that he knew of its dangerous condition.
 
 
 8
 Tenn.Code Ann. Sec. 28-102(8).
 
 
 9
 These definitions essentially codify the "consumer expectation test" as the basis in Tennessee for assessing products liability. See Higgs v. General Motors Corp., 655 F.Supp. 22, 26 (E.D.Tenn.1985), aff'd without op. sub nom. Thomas v. Subaru, 815 F.2d 80 (6th Cir.1987). Courts construing Tennessee law also have applied the consumer expectation test to products liability actions and held that, when a product's danger is not beyond the contemplation of the ordinary consumer, the product is not defective or unreasonably dangerous. See, e.g., Roysdon v. R.J. Reynolds Tobacco Co., 849 F.2d 230 (6th Cir.1988) (cigarettes not defective or unreasonably dangerous); Reece v. Lowe's of Boone, Inc., 754 S.W.2d 67 (Tenn.App.1988) (absence of flag on go-Kart does not render go-Kart defective or unreasonably dangerous).
 
 
 10
 The evidence disclosed that Mr. and Mrs. Silver received the Fry Daddy as a wedding gift six to seven years prior to the accident. Mrs. Silver used the product regularly. She admitted having read and understood the product's accompanying instruction booklet containing cautionary warnings. The booklet specifically warned that close supervision is essential when appliances are used in the presence of children and that users of the fryer should not let the cord hang over table or counter edges. Mrs. Silver testified that, in her trailer home, she strictly adhered to a rule that neither of her children were permitted in the kitchen while she was cooking because of the potential danger posed by hot appliances. (App. 457, 462-63). She testified that she knew the Fry Daddy was hot on the day of the accident and that the oil inside became extremely hot. (App. 459).
 
 
 11
 In attempting to demonstrate that the fryer was defective or unreasonably dangerous, Silver noted that the original design of the unit, like other portable appliances, was governed by, among other things, Underwriters Laboratories' Standard 1083 (UL 1083), which provides that special consideration should be given to the need for an enclosure of the cooking compartment of an appliance employing hot oil or grease. (App. 161, 165). Compliance with the safety standards promulgated by UL is one of the company's conditions for listing a manufacturer's product. Silver established that NPI engineers who designed the Fry Daddy were unfamiliar with UL 1083 and did not consider employing a locking lid on their product. Although NPI's apparent failure to incorporate this possible feature has some evidentiary value, it does not, without more, render the Fry Daddy defective or unreasonably dangerous.
 
 
 12
 Silver was unable to produce any other deep fat fryers that had locking lids.[5] She did, however, introduce testimony and drawings of James Hawkins, a graduate engineering student with no experience or expertise in consumer product safety. Hawkins indicated how a manufacturer could design a perforated locking lid for use during cooking with a Fry Daddy. (App. 148-60). He testified that he successfully fried potatoes in a Fry Daddy with such a lid in place. Hawkins showed the jury miscellaneous existing consumer products that incorporated his proposed design techniques. On cross-examination, however, Hawkins admitted that an aluminum lid would conduct heat, that any of his proposed perforated lids were not fluid tight, that cooking with the lid in place would generate pressure inside the cooking capsule, and that the lid would have to be removed periodically to stir the contents inside the fryer. He also admitted that he was unaware of any portable deep fat fryers manufactured and sold in 1977 that included a locking lid. (App. 411).
 
 
 13
 Based on the evidence before the district court, we conclude that Silver failed to establish a jury question as to whether the Fry Daddy was defective or unreasonably dangerous. The terms defective condition and unreasonably dangerous both focus on "what is anticipated or contemplated by the ordinary consumer." Higgs, 655 F.Supp. at 26. See also Roysdon, 849 F.2d 230. Although Silver is correct that section 29-28-105(d) provides that a product is not unreasonably dangerous based on a failure to adequately warn when a product's dangers are readily apparent, she is incorrect in claiming that a consumer's knowledge about a product's inherent hazards do not influence whether a product is unreasonably dangerous based on a design defect rather than on a failure to warn. It is true that subsection (d) of section 29-28-105 of the Act provides that a product is not "unreasonably dangerous" because of a failure to warn adequately when a product's dangers are apparent to the product's ordinary user. Nevertheless, the Act's definition of unreasonably dangerous contains no such restriction. That definition encompasses a condition dangerous to an extent beyond that contemplated by the ordinary consumer/purchaser of the product or a condition so dangerous that it would not be put on the market by a reasonably prudent manufacturer knowing of that condition. We cannot see that the fryer was any more dangerous than contemplated by Silver who, as noted, took active steps to protect her children from the dangers she fully appreciated as inherent in the fryer. Moreover, section 29-28-105(b) provides that the determination of whether a product is defective or unreasonably dangerous is to be made as of the time the product was marketed, considering available technology and knowledge, customary designs, techniques, methods, etc., of manufacturers of similar products. Silver was unable to demonstrate that the Fry Daddy design significantly deviated from any other deep fat fryer marketed at the time.
 
 
 14
 Although Silver urges this court to adopt a risk versus utility approach to this products liability action to determine whether a reasonably prudent manufacturer would have placed the Fry Daddy on the market as designed, we find no Tennessee authority for employing such an approach. Rather, as the court noted in Higgs:
 
 
 15
 While recognizing that the "consumer expectation" test has been codified in the Act, plaintiffs would urge this Court to employ ... the "risk/utility" test.... In light of the clear language of the Act, however, this Court declines to go any further than the Tennessee legislature intended the courts to go when it adopted the Act. Under this Act, plaintiffs must prove in a products liability action that the condition complained of is beyond contemplation of the ordinary consumer with the ordinary knowledge common to the community as to its characteristics.
 
 
 16
 655 F.Supp. at 26. See also Gann, 712 S.W.2d at 105 (Tennessee adheres to consumer expectation test).
 
 
 17
 As for Silver's contention that the Fry Daddy was in a defective condition, we note that "consumer knowledge about the risks inherent in the use of a product is one factor to be considered when determining if a product is defective." Roysdon, 849 F.2d at 236. As noted, other factors to consider in assessing a product's defectiveness include technology, knowledge, customary designs, etc., of similar products at the time of manufacture. See Tenn.Code Ann. Sec. 29-28-105(b). By definition, a defective condition must render a product "unsafe for normal or anticipatable handling and consumption." Tenn.Code Ann. Sec. 29-28-102(2). That the Fry Daddy conformed to Silver's normal or anticipated use is supported by her regular and satisfactory use of the product for some six to seven years. That she contemplated and thoroughly appreciated the dangers of the fryer to her children is evidenced by her cautionary measures and rules employed while using the fryer. That the product was not defective due to its design was supported by the nearly identical design employed by other manufacturers of deep fat fryers. As the Tennessee court noted in Kerley, 553 S.W.2d at 84, " 'a departure from the required standard of care is not demonstrated where it is simply shown that there was a better, safer, or different design which would have averted the injury.' " (Citation omitted).
 
 
 18
 Under these circumstances and giving due deference to the district judge's construction of state law, see Doherty v. Southern College of Optometry, 862 F.2d 570 (6th Cir.1988), we conclude that Silver has failed to demonstrate that the fryer is defective or unreasonably dangerous, whether because of a failure to warn adequately or the absence of a lid. The district court noted that deep fat fryers are obviously dangerous and unavoidably unsafe, and that even though a lid or a better warning might improve the product,[6] the product would remain obviously dangerous and unavoidably unsafe. The district court correctly granted NPI's motion for a directed verdict on this issue.
 
 II.
 
 19
 Silver also claims that NPI's failure to report to the Consumer Product Safety Commission (CPSC) at least seven known instances in which children were burned after knocking or pulling a NPI fryer off of a countertop constituted a violation of the Consumer Product Safety Act (CPSA),[7] 15 U.S.C. Sec. 2051, et seq., and negligence per se. Because we have concluded that the fryer was not defective or unreasonably dangerous, any negligence in failing to comply with the CPSA is not actionable under Tennessee's Products Liability Act. Even if NPI was negligent in failing to report the injuries to the CPSC, there was no evidence that NPI's negligence proximately caused the accident and resultant injuries here. See Steagall v. Dot Mfg. Corp., 223 Tenn. 428, 446 S.W.2d 515 (Tenn.1969) (causal link between negligence per se and injury needed to establish liability). In this case, Silver presented testimony of William F. Kitzes, who was employed by the CPSC from 1975 until 1981, and who indicated that the reporting requirements of the CPSA enable independent safety analysts to examine a defect and work with the manufacturer to "fix" it and thereby render a product safe for consumers. He also indicated that had the CPSC been notified of the injuries associated with the Fry Daddy, it could have ordered a recall, additional warnings, a retrofit, or taken no action at all. He did not testify what the CPSC would have done in this case.
 
 
 20
 Silver's proofs that, with notice of the injuries, the CPSC would have taken remedial measures that would have prevented the injuries in this case are too attenuated and speculative to establish the requisite causal connection.
 
 III.
 
 21
 Silver's contention that NPI was negligent in failing to adhere to an adequate corporate safety policy to identify and correct product hazards also fails. The notion of establishing such a policy apparently was advocated in a 1975 CPSC committee handbook. The handbook recommends establishing a policy that allocates responsibility relative to consumer product safety to all levels of a manufacturer, provides for hazard and risk analysis of products at their design stage, and that responds to consumers' experience with a given product. Essentially, the policy seeks to enable manufacturers to correct product problems and issue warnings and/or recall notices. Silver established that such policies have been adopted by such entities as Sears and Honeywell. The proposition that, had NPI employed an "adequate" corporate safety policy, the Fry Daddy would have been designed differently (or recalled) and the different design would have prevented the plaintiff's son's accident and resultant injuries suffers from the same causation problem as Silver's CPSA argument--it is too speculative. There is no evidence that NPI's lack of or inadequate corporate safety policy caused plaintiff's son's injuries.[8]
 
 
 22
 For the foregoing reasons, the directed verdict granted for NPI by the district court is AFFIRMED.
 
 
 
 [1]
 The Fry Daddy did have a plastic storage lid
 
 
 [2]
 Mrs. Silver's counsel indicates that the accident occurred when John apparently tugged on the thirty-inch electrical cord attached to the Fry Daddy. NPI's counsel claims that the cause of the accident is unknown and cites testimony of Mrs. Silver indicating that she had placed the cord upon the counter out of reach, and guessing that John grabbed the slotted spoon that came with the unit. She surmised that the spoon was lodged underneath the cord with its handle extending over the edge of the counter
 
 
 [3]
 In pertinent part, Tenn.Code Ann. Sec. 29-28-102(6) defines product liability actions as
 all actions brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging or labeling of any product. It shall include, but not be limited to, all actions based upon the following theories: strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent, or innocent; misrepresentation, concealment, or nondisclosure, whether negligent, or innocent; or under any other substantive legal theory in tort or contract whatsoever.
 
 
 [4]
 Section 29-28-105 is entitled "Determination of defective or dangerous condition," and states:
 (a) A manufacturer or seller of a product shall not be liable for any injury to person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.
 (b) In making this determination the state of scientific and technological knowledge available to the manufacturer or seller at the time the product was placed on the market, rather than at the time of injury, is applicable. Consideration is given also to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products.
 (c) The provisions of this section do not apply to an action based on express warranty or misrepresentation regarding the chattel.
 (d) A product is not unreasonably dangerous because of failure to adequately warn of a danger or hazard that is apparent to the ordinary user.
 
 
 [5]
 NPI established that the other portable deep fat fryers on the market, like the Fry Daddy, only included a plastic storage lid
 
 
 [6]
 The court noted the expert testimony indicating that a lid could retard spillage if the fryer tipped over. The court also noted, however, that such a lid would need holes to release steam and would have to be removed to insert, stir, and remove food. Accordingly, the court determined that, although the lid could conceivably decrease one's exposure to a hot oil spill, a lid could not have eliminated the risk and the absence of the lid did not render the product defective or unreasonably dangerous
 
 
 [7]
 The Act seeks to protect the public against unreasonable risks of injury from consumer products. It requires consumer product manufacturers to report any information that reasonably indicates that a product contains a hazardous defect of substantial magnitude. Silver did not seek to bring a private cause of action under the Act
 
 
 [8]
 To illustrate that a corporate safety policy would not have prevented necessarily the injuries in question, NPI notes that, notwithstanding Sears' "model" corporate safety policy, Sears was sued for injuries sustained involving an identical NPI fryer relabeled for Sears and sold under its own name