IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 20, 2010 Session

## RICHARD P. ALEXANDER, JR., Individually and as Personal Representative of the ESTATE OF JUNE ALEXANDER, Deceased, and as Parent and Guardian of R.C.A, a Minor, ET AL. v. ANTONIO ZAMPERLA, S.p.A., ET AL.

Appeal from the Circuit Court for Sevier County
No. 2005-0150-III, 2005-0153-I, 2005-0152-IV    Rex Henry Ogle, Judge

No. E2009-01049-COA-R3-CV - FILED AUGUST 27, 2010

Richard P. Alexander, Regina Phillips, Gail Young and Judy Sprinkles ("Plaintiffs") filed this products liability suit against Antonio Zamperla, S.p.A. and Zamperla, Inc. ("Defendants"), as a result of June Alexander's death that occurred while riding an amusement park ride manufactured by Defendants. Defendants moved for summary judgment. After a hearing, the trial court entered an order granting Defendants summary judgment, finding the act of a third party constituted both a superseding cause of the death and an alteration of the product which relieved Defendants of liability. Plaintiffs appeal. We affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR. and D. MICHAEL SWINEY, JJ., joined.

R. Price Nimmo and Niles Nimmo, Nashville, Tennessee, for the appellants, Richard P. Alexander, Jr., Individually and as Personal Representative of the Estate of June Alexander, Deceased, and as Parent and Guardian of R.C.A., a Minor, and Regina Phillips, Individually, and Gail Young and Judy Sprinkles.

Robert R. Davies, Knoxville, Tennessee, and Thomas M. Sheehan, Cary, Illinois, for the appellees, Antonio Zamperla, S.p.A. and Zamperla, Inc.

## OPINION

## I. BACKGROUND

Rockin' Raceway ("Raceway"), an amusement park in Pigeon Forge, Tennessee, purchased an amusement ride called the "Hawk 24" ("the Hawk") manufactured by Zamperla, S.p.A. from the distributor, Zamperla, Inc. The Hawk was delivered to Raceway's Pigeon Forge site in March 1998. The Hawk consists of 24 seats attached to the bottom of a pendulum.

Zamperla, Inc.'s Field Service Manager, Phil Castellano, was at Raceway from March 4, 1998, to March 6, 1998, to oversee the ride's set up, assembly, testing and operation training. Raceway's General Manager, Stan Martin, participated in the instruction and training conducted by Mr. Castellano. Mr. Martin, who had previously worked on missiles for the United States Air Force and on nuclear reactors for the Tennessee Valley Authority, would be responsible for the regular maintenance of the Hawk.

The Hawk's safety system utilized a harness that lowers over each passenger's torso. Once the harness is lowered over the passenger, steel rods engage to lock the harness to the seat frame in three locations: behind the passenger's head, above the passenger's right hip, and above the passenger's left hip. Once locked into place, any one of the three rods is strong enough to hold a rider in place by itself. The safety system prevented the ride from operating unless all of the passenger restraints were secure and all steel rods were engaged.

After March 6, 1998, Raceway and its staff, including Mr. Martin, were in exclusive custody and control of the Hawk. At Raceway's request, Mr. Castellano returned in October 1998 to address issues relating to the Hawk's loading platform and again in July 2000, to replace a coupler on the motor. Mr. Castellano did not place or observe any jumper wires in the Hawk's electrical cabinet at any time during his three visits to Raceway. Various Raceway employees confirmed that between 1998 and 2002, the Hawk would only run if all of the seat restraints were engaged; if all of the restraints were not secure, the Hawk would not operate because of safety devices in the ride.

Mr. Martin was the only person at Raceway who was "competent enough to work on the [Hawk]" and performed the regular maintenance. At some time between July 2000 and July 23, 2003, Mr. Martin intentionally and purposefully re-wired the Hawk's control panel to bypass the safety devices in the ride which are designed and intended to prevent it from operating unless the passenger restraints were secure.

On July 23, 2003, nearly five years post sale and three years after Zamperla Inc.'s last

-2-

contact with the Hawk, a Raceway guest, Ken Mace, was riding on the Hawk when his harness opened while he was upside down. Mr. Mace was able to hang on by bracing himself with his feet against the seat in front of him. Mr. Mace and his wife, Lucinda Mace, told the ride operator and Joe Dickson, the identified manager of the park at the time, about the harness coming open. Raceway employees told the Maces "the ride would not be used again until it was inspected by someone from Italy." Mr. Mace also contacted the Pigeon Forge Police Department to report his incident with the Hawk. When he learned of Mr. Mace's incident, and despite the life-threatening nature of it, Mr. Martin did not notify either Zamperla, Inc. or Zamperla S.p.A. of the occurrence and did not ask either Defendant to inspect the Hawk as promised to both Mr. Mace and the police. Instead, the ride continued to be operated by Mr. Martin and Raceway after Mr. Mace's close call.

On March 14, 2004, eight months after Mr. Mace's incident, June Alexander, her son R.C.A., and her sisters Judy Sprinkles and Gail Young, traveled to Pigeon Forge. During the trip they visited Raceway because R.C.A. saw the Hawk at that amusement park and wanted to ride it. Mrs. Alexander agreed to ride the Hawk with her son and Ms. Sprinkles. After Mrs. Alexander had been placed in her seat, she advised the operator that she wanted to get off but was told that she could not. After the ride started, Mrs. Alexander became aware that the restraining device which was supposed to secure her in her seat was not functioning properly. She called out that she was not secure, but there was no response. When the ride was about 60 to 70 feet in the air, Mrs. Alexander was ejected and fell to her death. Unlike Mr. Mace, Mrs. Alexander was not able to hang on. Immediately after Mrs. Alexander's death, the Hawk was secured and continuously guarded by police until it could be inspected. Two days after the accident, an inspection was conducted with representatives from the Pigeon Forge Police Department, Plaintiffs, and Defendants present. When the Hawk's electrical cabinet was opened, an investigating police officer observed that two jumper wires – one red and one black – were attached with alligator clips to other wires exposed after the insulation was cut. The jumper wires had not been in the electrical cabinet when Zamperla's Field Service Manager, Mr. Castellano, saw the Hawk in March and October 1998 or in July 2000. An engineer retained by the State of Tennessee to assist in the police investigation determined that the jumper wires were installed to "bypass[] the designed safety logic." A consultant of the amusement industry participated in the inspection and noted that he had never seen a jumper wire used to bypass a safety system in his 37 years in the amusement industry.

Testing of the ride revealed that when the black jumper wire was removed, the Hawk would not operate unless the rods that hold the restraints in place were engaged. When the black wire was reattached, the Hawk would run even if the metal restraint rods were not engaged. In his report to the State, the investigating engineer observed that the incident occurred as "the direct result of intentional destruction of the ride safety system."

-3-

At his criminal trial, it was established that Mr. Martin: 1) had a technical background; 2) was the only person maintaining the Hawk; 3) knew of at least one incident of the Hawk operating when a passenger's restraint was not engaged; and 4) the Hawk's safety system was intentionally destroyed. At the conclusion of a jury trial, Mr. Martin was found guilty of reckless homicide. On appeal, the Court of Criminal Appeals affirmed the trial court's verdict and held that Mr. Martin "was responsible for placing on the ride the jumper wire that bypassed the safety restraint mechanism."

In March 2005, Plaintiffs filed a complaint against Defendants, as well as against Hamlinco, Inc. d/b/a Rockin' Raceway and Mr. Martin, as the owner and general manager respectively of the amusement park at the time Mrs. Alexander was killed. The owner of Raceway and Mr. Martin were voluntarily nonsuited by Plaintiffs and were dismissed from the action without prejudice. Thereafter, Plaintiffs filed a First Amended Complaint against only these Defendants. Following discovery, Defendants moved for summary judgment, and on April 14, 2009, the trial court conducted a hearing on the dispositive motion. After argument by counsel, the court stated that it was granting Defendants' motion on the basis 1) that a third party's placement of a jumper wire in the electrical control panel of the ride was not foreseeable and was a criminal act constituting a superseding cause of the decedent's death, and 2) that the safety system of the Hawk had been significantly altered. On June 3, 2009, the trial court entered its order granting Defendants' motion for summary judgment on the above grounds. Plaintiffs filed this timely appeal.

## II. ISSUES

Plaintiffs raise the following issues on appeal:

1. Whether the trial court erred in granting summary judgment to Defendants on the basis that a third person's act in placing a jumper wire in the ride's electrical control panel was a superseding cause that relieved Defendants of liability?

2. Whether the trial court erred in granting summary judgment to the Defendants on the basis that the third person's same act with respect to the ride also constituted an alteration of the product that relieved Defendants of liability?

## III. STANDARD OF REVIEW

-4-

Tenn. R. Civ. P. 56.04 provides that summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, *see Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); and (2) the moving party is entitled to judgment as a matter of law on the undisputed facts. *See Anderson v. Standard Register Co.*, 857 S.W.2d 555, 559 (Tenn. 1993).

In *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1 (Tenn. 2008), the Tennessee Supreme Court clarified the moving party's burden of proof in a summary judgment motion. A moving party who seeks to shift the burden of production to the nonmoving party who bears the burden of proof at trial must either: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial. *Id.* at 5. According to the Court, when a party seeking summary judgment has made a properly supported motion, the burden shifts to the non-moving party to set forth specific facts establishing the existence of disputed, material facts which must be resolved by the trier of fact. *Id.; see Byrd*, 847 S.W.2d at 215; *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997). The non-moving party may not simply rest upon the pleadings, but must offer proof by affidavits or other discovery materials (depositions, answers to interrogatories, and admissions on file) to show that there is a genuine issue for trial. If the non-moving party does not so respond, then summary judgment, if appropriate, shall be entered against the non-moving party. Tenn. R. Civ. P. 56.06.

There is no presumption of correctness for summary judgments on appeal. See *City of Tullahoma v. Bedford County*, 938 S.W.2d 408, 412 (Tenn. 1997). This court must view all of the evidence in the light most favorable to the non-movant and resolve all factual inferences in the non-movant's favor. *Luther v. Compton*, 5 S.W.3d 635, 639 (Tenn. 1999); *Muhlheim v. Knox County Bd. of Educ.*, 2 S.W.3d 927, 929 (Tenn. 1999). When the undisputed facts, however, support only one conclusion, then the moving party is entitled to judgment as a matter of law and a summary judgment will be upheld. *See White v. Lawrence,* 975 S.W.2d 525, 529 (Tenn. 1998); *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

## IV. DISCUSSION

### A.

Plaintiffs argue that the intervening act of a third party in placing a jumper wire in the ride's electrical control panel was reasonably foreseeable to Defendants and thus does not absolve them of liability. In support of this contention, Plaintiffs correctly assert that an act cannot be a superseding cause that relieves the original wrongdoer of liability unless the

intervening act could not reasonably have been foreseen and unless the act was a substantial factor in bringing about the harm. *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991). Indeed, a reasonably foreseeable criminal act of a third person is not a superseding cause of the injury and does not break the chain of causation to relieve the defendant of liability. *Louria v. Brummett*, 916 S.W.2d 929, 930 (Tenn. Ct. App. 1995); *see generally* Restatement (Second) of Torts §448 (1965) (criminal act of third person is not a superseding cause of the plaintiff's harm when the defendant should have realized that his negligent conduct would create a situation where a third person could commit a criminal act). Plaintiffs also correctly cite *McClenahan* for the proposition that whether an intervening cause rises to the level of a superseding cause so as to relieve a defendant of liability is "particularly" a question for the jury, because of foreseeability considerations. *McClenahan*, 806 S.W.2d at 776.

We are not persuaded by Defendants' attempts to severely limit the *McClenahan* holding to its unique circumstances in which the intervening criminal conduct at issue was caused by the defendant's own criminal conduct in leaving keys in the ignition of an automobile. Further, we are not willing to say that product manufacturers are per se exculpated by the criminal actions of third parties as being necessarily superseding causes, as urged by Defendants. The proper case may well present itself such that a product manufacturer's apparent negligence appropriately should be submitted to the jury for a determination of the foreseeability of the third party's intervening criminal conduct to the manufacturer. However, we are unconvinced that the present action against the ride manufacturer based on Mr. Martin's intentional conduct in overriding the ride's safety system is such a case.

Even viewing the evidence in favor of Plaintiffs as the nonmoving party and drawing all reasonable inferences in favor of them, we are unable to say a genuine issue of material fact exists as to the foreseeability of the park manager's act in placing the jumper wire in the ride's electrical control panel. Plaintiffs contend that one of their experts, Mr. Timothy Rickard, testified to the foreseeability of the intentional bypassing of the ride's safety system. We find, however, that Mr. Rickard's proffered testimony, the same sparse and limited evidence which Plaintiffs primarily rely on throughout their case to demonstrate the existence of material factual issues, makes no reference to the foreseeability of the park manager's intentional conduct at issue. Instead, Mr. Rickard describes in his testimony his "preferred" design for safety systems in general. Specifically, he opines to his preference for safety systems that "have three layers," that Plaintiffs ostensibly contrast with the Hawk's safety system which the park manager was able to bypass "by a single act, namely, a jumper wire." Yet Mr. Rickard concedes that even with this preferred design, "someone with an electrical background and the desire to jump this out . . . could do that and get the ride to run." Indeed, Mr. Rickard's testimony fails to reveal whether his preferred system was in any way related

to prevention of such intentional bypassing of the Hawk's safety system, especially by an individual with the technical expertise of Mr. Martin. On the contrary, he agreed that the Hawk's safety system was "state of the art" when it was designed. Accordingly, we disagree that this testimony even impliedly addresses the foreseeability of the intentional bypassing of the ride's safety system sufficient to raise a genuine issue of material fact, whether by an individual as technically knowledgeable as Mr. Martin or otherwise.

Furthermore, as Defendants correctly assert, the record reveals no reason to suspect that the park manager would intentionally bypass the safety system on the Hawk ride. As the Court of Criminal Appeals observed:

> [The park manager] had no prior criminal history . . . had never abused alcohol or drugs. He was married, had a history of gainful employment, and was honorably discharged from the Air Force after six years of active duty. . . . [He] had the support of several friends and members of the community, many of whom attested in letters to [Mr. Martin's] generosity, good character, and involvement with the church."

Accordingly, we agree Defendants had no apparent reason to believe the manager of an amusement park, especially this manager, would criminally bypass the ride's safety system and place the park's guests in peril. Rather, the owner and ride operator would be expected to properly maintain and safely operate the ride, and, further, notify Defendants of any problems experienced with the ride. Moreover, Plaintiffs have not identified a single incident or injury arising from the intentional bypassing of a sophisticated amusement ride's safety systems similar to the Hawk's. To the contrary, one of Defendants' experts stated that he had never encountered anything like this event in over 37 years in the amusement ride industry. Under the circumstances, we must disagree with Plaintiffs' portrayal of the park manager's intentional conduct as reasonably foreseeable or presenting a triable issue of fact.

Plaintiffs similarly argue that "the safety system could have been designed to prevent operation of the ride in the event that a jumper wire had been placed into the electric control panel." Therefore, they contend the ride was defective and/or unreasonably dangerous within the meaning of the Tennessee Products Liability Act, Tenn. Code Ann. § 29-28-101 et seq. (2000), to the extent that it was "easily negated" by the park manager's intervening conduct that was "made possible and brought about by the original negligence in the design of the safety system and cannot, therefore, rise to the level of a superseding cause . . . ." However, we are unable to conclude that Plaintiff's proffered evidence, the same expert testimony with tenuous relevance discussed above, demonstrates the existence of a genuine issue of material fact as to whether a reasonable manufacturer under similar circumstances would have used a different design. The same factors discussed above that tend to negate the foreseeability

of the park manager's intentional conduct also defeat Plaintiffs' claims of manufacturer negligence in the design of the ride's safety systems, for similar if not identical reasons.

Contrary to Plaintiffs' characterization of the ride as "easily negated," Defendants demonstrated that the Hawk has an apparently complicated and sophisticated safety system that incorporates multiple features designed to protect passengers. Further, as briefly mentioned above, the park manager had technical knowledge from years in the United States Air Force working on Minutemen Intercontinental Ballistic Missiles and his post-military career working on the maintenance, safe operation and quality inspections of nuclear reactors for the Tennessee Valley Authority. Such highly specialized technical expertise undoubtedly contributed to his ability to intentionally bypass the relatively complex wiring of the ride's safety system. Plaintiffs' expert testimony, primarily relied upon for providing the basis for their asserted genuine issues of material fact, does not address any of these factors in any degree but merely refers to a preference for safety systems in general that involve multiple levels. It is unclear whether such testimony even tends to show the existence of the mere possibility of an alternative design; however, as Defendants correctly assert, it is well-established in Tennessee that such a possibility of an alternative design is completely insufficient to find a product "defective." *See, e.g., Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1430 (E.D. Tenn. 1991) ("Where it is simply shown that there is a better, safer, or different design which would have averted the injury, this does not establish that there has been a departure from the required standard of care").

For Plaintiffs to establish their prima facie products liability case, they must prove that the Hawk was "in a defective condition" or "unreasonably dangerous" when it left Defendants' control. Tenn. Code Ann. § 29-28-105(a) (2000).[1] "Defective condition" is defined as "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Tenn. Code Ann. § 29-28-102(2) (2000). When determining whether a product is defective:

> [T]he state of scientific and technological knowledge available to the manufacturer or seller at the time the product was placed on the market, rather than at the time of injury, is applicable. Consideration is given also to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products.

---

[1]Tenn. Code Ann. § 29-28-105(a) (2000) sets forth the elements plaintiffs must prove for a product liability action: "A manufacturer or seller of a product shall not be liable for any injury to a person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller."

Tenn. Code Ann. §29-28-105(b) (2000). It is well established that "the actual design of the product does not have to be perfect, accident proof, or incapable of causing injury to be considered non-defective." *See, e.g., Curtis*, 778 F. Supp. at 1430; *Bishop v. Smith & Nephew Richards, Inc.*, No. 02A01-9405-CV-00108, 1995 WL 99222, at *9 (Tenn. Ct. App. W.S., Mar. 10, 1995) (stating that manufacturers are "not required to design a perfect or accident-proof product").

Accordingly, the record fails to demonstrate the existence of a triable issue of material fact as to whether the Hawk was defective as designed when it left Defendant's control. Plaintiff's liability experts apparently were as unable to specify any defects as they were to testify to the foreseeability of the park manager's intentional bypassing of the ride's safety system. To the contrary, after reviewing the Hawk's operating program, the wiring schematics, the specification sheets for the Hawk's switches and inspecting the ride, Mr. Rickard agreed that "the control system was properly designed to do what it intended to do." He also agreed that the Programmable Logic Control on the Hawk was "state of the art" when it was designed. Plaintiffs' other proffered liability expert added that "the mechanical aspects of the restraints looked robust and well-made . . . the lap restraint . . . looked robust, well-made and reasonably adequate for the purpose."

Likewise we are unconvinced the record provides any indication of an unreasonably dangerous design of the Hawk's safety systems. By statute, two tests exist for determining whether a product is unreasonably dangerous: the "consumer expectation test" and the "prudent manufacturer test."[2] We agree with Defendants that the prudent manufacturer test is the more appropriate analysis for the instant case, although the tests are not necessarily mutually exclusive, because:

> The prudent manufacturer test is applicable to more complex products, or more complex operation or construction of a product, about which an average consumer would have no basis for forming any expectation. For example, ordinary consumers would have a basis for expectation about the safety of a can opener or coffee pot, but, perhaps not about the safety of a fuel-injection engine or an air bag.

*Irion v. Sun Lighting, Inc.*, No. M2002-00766-COA-R3-CV, 2004 WL 746823, at *5 (Tenn.

---

[2]Tenn. Code Ann. § 29-28-102(8) (2000) defines "unreasonably dangerous" as a product that is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller know of its dangerous condition."

Ct. App. M.S., Apr. 7, 2004) (internal citations omitted).

The prudent manufacturer test turns on whether, balancing all the relevant factors, a reasonably prudent manufacturer would market the product if it had knowledge of the dangerous condition. *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 282-83 (Tenn. 2005).[3] In addition, Tenn. Code Ann. § 29-28-104 (2000) provides:

> Compliance by a manufacturer or seller with any federal or state statute or administrative regulation existing at the time a product was manufactured and prescribing standards for design, inspection, testing, manufacture, labeling, warning or instructions for use of a product, shall raise a rebuttable presumption that the product is not in an unreasonably dangerous condition in regard to matters covered by these standards.

Accordingly, we have held that lack of significant deviation from similar products on the market and general compliance with industry standards or regulations strongly weigh against manufacturer liability. *See Curtis*, 778 F.Supp. at 1431 (summary judgment granted when products liability plaintiffs offered no proof that the product, a cigarette lighter, deviated from other lighters on the market or that other lighters had child-proof safety features or that the product did not perform in its expected manner); *Silver v. National Presto Indus., Inc.,* 884 F.2d 1393 (6th Cir. 1989) (Table, unpublished decision) (text 1989 WL 106290) (defendant directed verdict granted for lack of proof that the product, a portable deep fryer, was unreasonably dangerous for failing to have a locking lid in light of industry practice at the time).[4]

Similarly, Plaintiffs have failed to offer any proof to suggest that the Hawk deviated in any significant way from industry standards as to amusement park ride safety systems, either at the time the ride was sold to Raceway or at present. Moreover, as Defendants have shown, the Hawk complied not only with industry practice, but also applicable federal and state standards governing amusement ride safety systems. The Consumer Product Safety Commission ("CPSC"), who investigated and reported on this incident, did not order a recall

---

[3]Factors we consider when determining whether a manufacturer acted prudently include: the usefulness and desirability of the product, the safety aspects of the product, the availability of a substitute product which would meet the same need, the manufacturer's ability to eliminate the unsafe character, the user's ability to avoid danger, the user's awareness of the danger, and the feasibility of spreading the loss. *Ray v. BIC Corp.*, 925 S.W.2d 527, 532 (Tenn. 1996).

[4]Although the Sixth Circuit Local Rule 24(c) disfavors the citation of its unpublished opinions, the district court in *Curtis* relied upon *Silver*'s "precedential value." We will do the same. *See Curtis,* 778 F. Supp. at 1428, n. 1.

for this ride; did not issue any public warnings; and did not take any action against Defendants as a result of the incident. In other words, despite knowing that there was a fatality on a device the CPSC is charged with safely maintaining, the CPSC allowed and continues to allow all such Zamperla rides to remain in operation today. We find the fact that major amusement parks, including Six Flags, at present continue to operate rides with identical or similar safety systems as the Hawk to be particularly revealing in terms of Defendants' culpability under the prudent manufacturer test. Furthermore, Defendants have shown that the Hawk was designed and manufactured in full compliance with the American Society of Testing Materials ("A.S.T.M.") standards applicable to Defendants when the ride was manufactured in 1997. Therefore, we are convinced of the ride's compliance with all applicable federal and state statutes, administrative regulations and industry standards, and further of Plaintiff's lack of proof to establish Defendants' liability under the prudent manufacturer test, or to otherwise effectively demonstrate a defective/unreasonably unsafe design that caused the death. As we have stated in a similar case,

> [t]he undisputed and relevant facts concerning this issue are that [the manufacturer] did not manufacture or, in any way, condone the use of the [jumper wires] with this piece of equipment. It is undisputed that [the owner], not [the manufacturer] rigged [the safety system for use with a jumper wire] . . . [M]anufacturers are entitled to rely upon the common sense and good judgment of consumers and users.

*Shoemake v. Omniquip Int'l, Inc.*, 152 S.W.3d 567, 574-75 (Tenn. Ct. App. 2003) (citation omitted).


B.


Plaintiffs also argue the trial court was in error in determining that the park manager's intentional overriding of the ride's safety system constituted an alteration of the product sufficient to relieve Defendants of liability. As Plaintiffs correctly assert, foreseeable misuse is not a defense to a products liability cause of action. *See Martin v. Michelin N. Am., Inc.*, 92 F.Supp.2d 745, 759 (E.D. Tenn. 2000). Exculpating alteration/misuse under the Tennessee Products Liability Act is expressly defined as the "subsequent unforeseeable alteration, change, improper maintenance or abnormal use" by the product-user that rendered it unreasonably dangerous. Tenn. Code Ann. § 29-28-108 (2000). We are not persuaded by Defendants' attempts to broadly construe present Tennessee products liability case law to mean that manufacturers may never be held liable whenever a third party intentionally bypasses the safety system installed by the manufacturer. Instead, we agree with Plaintiffs that the availability of the alteration/misuse defense could present a genuine issue of material

fact in cases of a product user's intentional disabling of a product's safety device. Thus, the applicability of the defense would trigger the fact-finder's determination of the foreseeability of the user's intentional disabling of a particular safety device.

However, we agree with the trial court that such a triable issue of material fact does not exist in the present case. Plaintiffs' arguments as to the foreseeability of the "alteration" must fail for the same reasons their attempts to portray the same conduct as a foreseeable intervening cause of the injury failed. That is, Plaintiffs' same three pages of expert testimony regarding the mere possibility of alternative safety systems, relied on heavily elsewhere for supporting the existence of a genuine issue of material fact, are again offered in support of the foreseeability of the disabling of the safety device as the disputed alteration. As discussed above at length, we decline to conclude that such a meager offering raises a genuine issue of material fact under the circumstances. Specifically, the lack of any actual notice provided to Defendants, the lack of any evidence whatsoever of any similar intentional alterations of which Defendants should have been aware, and the admittedly "state of the art" design of the ride and its safety systems when it left their control, convinces us of the appropriateness of the trial court's decision. Accordingly, we hold that Plaintiffs have failed to provide sufficient proof to cause reasonable minds to doubt whether the park manager's intentional bypassing of the Hawk's safety system was an unforeseeable alteration or superseding cause of June Alexander's tragic death.

## V. CONCLUSION

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellants, Richard P. Alexander, Jr., Individually and as Personal Representative of the Estate of June Alexander, Deceased, and as Parent and Guardian of R.C.A., a Minor, and Regina Phillips, Individually, and Gail Young, and Judy Sprinkles. This case is remanded, pursuant to applicable law, for collection of costs assessed below.

_____
JOHN W. McCLARTY, JUDGE