Gail W. KERLEY, as wife of E. Gary Kerley, Deceased

v.

The STANLEY WORKS, Massey Electric Company, Vinylex Corporation, and George W. Reagan Company Incorporated.

Court of Appeals of Tennessee, Eastern Section.

Feb. 1, 1977.

Certiorari Denied by Supreme Court May 31, 1977.

Norman H. Williams, Knoxville, for appellant.

Arthur D. Byrne, Knoxville, for the Stanley Works.

Robert R. Campbell, Knoxville, for Massey Electric Co.

Joseph B. Yancey and Patrick G. Kelly, Knoxville, for Vinylex Corp.

Calvin N. Taylor, Knoxville, for George W. Reagan Co., Inc.

## OPINION

SANDERS, Judge.

The Plaintiff, Gail W. Kerley, as wife of E. Gary Kerley, deceased, has appealed from a directed verdict in favor of the Defendants in her suit for the wrongful death of her husband.

The Defendant, Vinylex Corporation, contracted with the Defendant, George W. Reagan Company, Incorporated, to construct a building for it in Knox County. Defendant Reagan, in turn, let a contract to Defendant Massey Electric Company as a subcontractor for the electrical work. Reagan also subcontracted the installation of the doors in the building. This subcontractor then subcontracted this work to the now-deceased E. Gary Kerley.

While working on the installation of the doors and using an electric power drill manufactured by the Defendant, The Stanley Works, the decedent apparently received an electrical shock and fell from a 20-foot ladder to his death on a concrete floor.

The Plaintiff-Appellant, Gail W. Kerley, wife of the deceased, E. Gary Kerley, filed suit in the Circuit Court of Knox County against the Defendants-Appellees for the wrongful death of her husband. The Plaintiff's suit against The Stanley Works, manufacturer of the electric drill, is predicated upon the theory of strict liability and negligent design. Her suit against Massey Electric Company is predicated upon the theory it was negligent in the way and manner it installed the electric breaker-switch panel box to which the drill was connected at the time of decedent's electrical shock. She contends in her suit against Vinylex Corporation, as owner of the building, and George W. Reagan Company, as general contractor,

each had a nondelegable duty to provide the decedent a safe place to work. She says the negligence of the Defendant, Massey, is imputable to Defendants Vinylex and Reagan.

The case was tried before a jury and at the close of the proof the Court directed a verdict in favor of all Defendants.

The Plaintiff has appealed and assigned the action of the Court as error.

There is little or no dispute as to the material facts in the case. Approximately one year prior to the accident the decedent purchased an electric power drill manufactured by the Defendant, Stanley. The decedent used this drill regularly in his work as a subcontractor. There is no evidence of any malfunction of the drill prior to the date of the accident.

A short time prior to the accident the drill started malfunctioning. Sparks started flying from the bridge of the drill while it was running and the motor began stalling. It was apparent from the function of the drill there was a short or a defect in the wiring. The decedent undertook repairing the drill. The electrical cord which connects the motor with the electric source for the drill extends out through the base of the drill handle. At this point there was a rubber boot welded to the cord which covered the wiring and served as a tension arrester to keep tension off the wires on the inside of the drill when tension was exerted on the extended portion of the cord. There were three separate wires in the cord to the drill, a white wire, a black wire and a green wire. The white and black wires provided the electric current and the green wire served as a ground. To make the repairs the decedent removed the handle of the drill and upon doing so it was discovered there was a dark spot or burned place on the white wire inside the boot. The boot was cut away and removed. It was then apparent the white wire had burned in two. The insulation was removed from the two ends of the white wire, the ends twisted together, taped, and inserted into the handle of the drill.

After this repair a brief use of the drill indicated it was functioning normally. The decedent took the drill up a 20-foot ladder

to drill holes in a metal plate on an overhead door. He had been using the drill for several minutes when one of his employees heard him make a sound like a grunt. The employee said the decedent was leaning back on the ladder holding on to the ladder with one hand and holding the drill, which was still running in the other. The employee sensed the decedent was being shocked and he unplugged the extension cord to which the drill was attached. The employee started up the ladder after disconnecting the drill but before he could reach the deceased he fell, striking his head on the concrete floor. The decedent died immediately thereafter.

Prior to the date of the accident the Defendant, Massey, had installed a temporary circuit-breaker panel box from which electricity was distributed for use during construction. On the day of the accident the decedent had plugged an extension cord into this panel box for electrical current to operate his drill. The spot at which the decedent was working was approximately 150 feet from the panel box. Decedent had put three extension cords together to span this distance. Two of the extension cords contained three wires, two wires for the electrical current and one for ground. However, the ground plug had been broken off of one of the cords, making the ground ineffective. The third cord had no ground wire. Without a ground wire a short in the drill would permit the electrical current to flow through the body of the deceased.

The Plaintiff contends there was manufactured and available for installation on a panel box such as that installed by Defendant Massey a device known as a ground fault circuit interrupter (referred to as a GFI device) which would have prevented deceased's being shocked. She contends the Defendant was negligent in not installing the GFI device and this was the proximate cause of decedent's death.

The GFI device reacts to break the circuit of electrical current much more rapidly than either the fuse or circuit breaker. It reacts to an imbalance of current in milliamps and had one been in use at the time of the accident the deceased would have perhaps felt little or no shock even though he was using an ungrounded drill.

The GFI device was developed in Europe a number of years ago. Although it is used extensively there, its introduction in this country did not occur until about 1970. The proof indicates there had been a growing use of the device in this county at the time of the accident (1973) but it was not uniformly used nor was it a requirement of the National Electrical Safety Code. The National Electrical Code is recognized as the guideline for the electrical industry. It has been adopted as the general safety rules and regulations of the construction industry by the Department of Labor of the State of Tennessee. It insures an installation essentially free from hazards.

The panel box had been installed in compliance with the National Code and was described by one expert witness as being superior in quality to the accepted standards for such installations. There is no proof of any defect in the installation nor is there any contention by the Plaintiff of any deficiency other than the absence of the GFI device.

At the time of the accident the decedent was violating the National Electrical Code and the accepted rules of safety by using an ungrounded extension cord. Had the drill been properly grounded the accident would not have occurred.

In addressing the safety features of the panel box installation, one of Plaintiff's expert witnesses testified, "GFI is obviously safer. Oh, this is . . . may I qualify that? To be perfectly correct about it. As long as the ground wire is functional, it's safe too."

While compliance with the standards of the National Electrical Safety Code is not conclusive as to Defendant's negligence, there must be evidence in the record from which the jury could find the minimum standards of the Code were insufficient under the facts and circumstances of the case. *City of Elizabethton v. Sluder*, Tenn., 534 S.W.2d 115 (1976).

■ The undisputed proof shows there were no defects in the installation. The installation was safe. It was the negligence of the deceased, not that of the Defendant, which caused his injuries.

In the absence of any proof of negligence on the part of the Defendant, Massey, we find no error in the Court's directing a verdict as to this Defendant.

Since the liability of the Defendants, Vinylex and Reagan, would be derivative from the negligence of Massey, we find no error in the directed verdict as to these Defendants.

The Plaintiff says it was error for the Court to direct a verdict as to Defendant Stanley. She insists the proof presents a jury question on defects in the drill at the time of the accident and negligent design of the drill.

An examination of the drill after the accident revealed a ground wire in the drill cord was broken. However, there is no proof as to when or how the wire was broken. Most significantly, there is no proof it was broken at the time it left the manufacturer.

Our courts have recognized the doctrine of strict liability upon manufacturers as outlined in 2 Restatement (2d) Torts, § 402A. *Ford Motor Company v. Lonon,* (1966) 217 Tenn. 400, 398 S.W.2d 240; *Olney v. Beaman Bottling Co.,* (1966) 220 Tenn. 459, 418 S.W.2d 430; *Ford Motor Company v. Eads,* (1970) 224 Tenn. 473, 457 S.W.2d 28. Sec. 402A of the Restatement is as follows:

"Special Liability of Seller of Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

In *Ford Motor Company v. Lonon, supra,* 398 S.W.2d at page 249, the court said:

"It should be noted that the above section requires the plaintiff to establish that the product, when it left the hands of the manufacturer or other supplier, was at that time in both a defective and an unreasonably dangerous condition."

\* \* \* \* \* \*

"where the plaintiff can sustain the heavy burden of showing, as he must, that the product was in a dangerously defective condition at the time it left the hands of the manufacturer, it is quite likely that some negligence was involved even though this cannot be proved. See Wade, supra, 19 Sw.L.J. 5 (1965); Noel, Products Liability of Manufacturers—To Manufacturers of Products—The Drift Toward Strict Liability, 24 Tenn.L.Rev. 963, 1012–13 (1957)."

The drill had been in use for approximately a year before the broken wire was discovered. At the time the accident occurred the extension cord to the drill was tied to the ladder on which the decedent was working. When the drill was dropped it fell about 10 feet and, since the tension arrester had been removed, the full force of the jerk on the cord was extended to the wires within the drill and could have separated the ground wire.

The Defendant, Stanley, offered uncontradicted proof that every drill is tested before it leaves the factory. Two tests are conducted to make sure the drill is properly grounded by the ground wire. One test is a dialectric test. This test subjects the drill to high voltage and will reveal any defect in insulation or grounding. Even if the

ground wire was broken when the drill left the manufacturer, this would not have contributed to decedent's injuries since he was using an ungrounded extension cord.

■ The Plaintiff also insists the housing and component parts of the drill were negligently designed, which resulted in decedent's injuries. The proof shows the wire between the reverse switch and the motor of the drill had been damaged to the extent the insulation had been cut away and the bare wires came in contact with the housing of the drill. It is the insistence of the Plaintiff the design of the drill was the cause of this wire's being damaged. It is her theory that when the decedent put the handle back on the drill, after removing it for repairs, the wire was pinched by being caught between the housing and the handle, resulting in the damage. Plaintiff says there should have been more room for the wires inside the drill and the wires should have been contained in a harness to avoid loose wires being caught between the handle and the housing, resulting in such damage. The Plaintiff offered expert witnesses who testified that, in their opinion, the wire was damaged when caught between the handle and housing of the drill, but neither of these witnesses expressed an opinion as to any defect in the design of the drill which would make it inherently dangerous to the user.

"A manufacturer, . . . is not an insurer of the product he designs, and it is not required that the design adopted be perfect, or render the product accident proof, or incapable of causing injury, nor is it necessary to incorporate the ultimate safety features in the product. Hence, a departure from the required standard of care is not demonstrated where it is simply shown that there was a better, safer, or different design which would have averted the injury." 72 C.J.S. Supp. Products Liability § 21.

The assignments of error are overruled. The judgment of the Trial Court is affirmed and the cost of the appeal is taxed to the Appellant.

GODDARD, J., and ROSS W. DYER, Special J., concur.