Pearl GRISSOM, Plaintiff-Appellee,

v.

MODINE MANUFACTURING
COMPANY,
Defendant-Appellant.

Court of Appeals of Tennessee,
Eastern Section.

Aug. 8, 1978.

Certiorari Denied by Supreme Court
May 7, 1979.

James A. Ridley, III, Hugh W. Morgan, Knoxville, for defendant-appellant.

Jess D. Campbell, Knoxville, for plaintiff-appellee.

SUMMERS, Judge.

Pearl Grissom, plaintiff-appellee, sued Modine Manufacturing Company and Robertshaw Controls Company in the Circuit Court of Knox County for the wrongful death of her husband, Ralph Henry Grissom. An order of nonsuit was entered as to Robertshaw Controls Company. Modine Manufacturing Company is the defendant-appellant before this court.

This case was tried before a jury which awarded the plaintiff the sum of $185,-000.00. Defendant appealed from the verdict.

The accident of October 23, 1974, in which the plaintiff's husband suffered his fatal burns occurred at the new vocational building of the Powell Valley High School in Claiborne County, Tennessee. Mr. Grissom was attempting to light the pilot light of the fifth in a series of six Modine heaters in the school building. Gas which had escaped into the room exploded and burned Mr. Grissom over 95 per cent of his body. He died on October 25, 1974.

The heater Mr. Grissom was attempting to light was manufactured by the defendant at its plant in Buena Vista, Virginia, in November, 1973. Later that same month it was shipped to Cureton Plumbing and Heating Company of Knoxville. Cureton installed the six Modine heaters in the new vocational building during the late spring or early summer of 1974. Two heaters were installed in each of the three shop rooms. Cureton was the employer of Mr. Grissom at the time he was sent to the school with instructions to light the pilot lights of the heaters which had been installed.

Mr. Grissom lit the pilot lights of the first four heaters but had trouble with the fifth heater. Charles Cheek, one of the teachers at the school, testified he watched Mr. Grissom attempt to light the fifth heater; when it didn't light, Mr. Grissom used a wrench or pair of pliers and turned a valve on a pipe which supplied gas to the heater. Again the pilot didn't light, and Mr. Cheek left the room at this time.

Thomas Tinnell, another teacher at the vocational school, testified that he then came into the room because the students in his classroom nearby had begun to complain of the odor of gas. He testified that they had noticed the odor for about 30 to 40 minutes. When he told Mr. Grissom this, Mr. Grissom said there was plenty of ventilation in the room and he would be through shortly.

Mr. Grissom lit another piece of cardboard to light the pilot light, and the gas in the room exploded. It started around Mr. Grissom's head and went all around him and spread throughout the room.

Plaintiff alleged in her complaint that the defendant was liable for the injuries and death of her husband in that the heater Mr. Grissom was trying to light was in a defective condition when it was sold. Plaintiff later amended her complaint to allege that "The defective condition of the heaters, which proximately cause the decedents death, was foreign materials on the downstream side of the pilot orifice of the heater which caused the difficulties the decedent experienced in lighting the heater. . . ."

The defendant answered denying that its heater was in a defective condition and averred that the decedent lit the pilot light in a manner which caused the dangerous accumulation of propane gas in the room in which the fire occurred.

Defendant listed six assignments of error, the first of which is:

1. The Trial Court erred in overruling defendant's motion for directed verdict or to set aside the jury's verdict, because there was no material evidence to show the gas which burned was introduced into the atmosphere from a defect in the heater.

*Lowe v. Preferred Truck Leasing, Inc.,* 528 S.W.2d 38 (1975), was a case dealing with injuries plaintiff received due to the alleged brake failure of the truck he was driving. The Eastern Section of the Court of Appeals said in regard to its review of jury verdicts:

This Court does not sit as a jury of three to reweigh the evidence in jury cases. Once a jury, who has the opportunity of seeing and hearing the witnesses themselves, has determined the factual issues involved in a law suit and that determination has been approved by the Trial Judge, we may only review the evidence to ascertain if there is any credible evidence upon which that determination may be predicated. If there is, then even if we believe that the trier of fact has reached an erroneous decision, we must accept it. As is well known to all who practice before the appellate courts of this state, the burden of showing that there was no credible evidence to support a jury verdict is a massively heavy one to bear.

However, this does not mean that we must passively sit by and allow patently, impossible, incoherent, or perjured testimony to support a jury verdict. The rule is that there must be some credible evidence—not merely some evidence—to support a jury verdict. That is, there must be some evidence which is capable of being believed by reasonable men, although we may not choose to believe it ourselves.

*McCandless v. Oak Constructors, Inc.,* 546 S.W.2d 592 (1976), was a case from the Middle Section of the Court of Appeals, in which that court referred to *Lowe, supra,* and said that even if the findings and the verdict of the jury are not necessarily those which that court would have reached, the court is not authorized to substitute its judgment for that of the jury where the verdict is supported by material and substantial evidence.

We agree with both cases above. In the instant case, however, we find no credible evidence on which the jury could have based its verdict that the defendant's heater was defective and that such defect was the cause of the injuries and resulting death of the plaintiff's husband.

Gerald Cureton of Cureton Plumbing and Heating Company, the company which contracted for all of the mechanical work at the vocational school, testified that the heaters had been installed at the school four or five months prior to the accident. He testified the heaters were tested when they

were hung and there were no problems with them as far as he knew.

Under cross examination Mr. Cureton said the following concerning Mr. Grissom's qualifications as an employee:

Ralph Grissom was an exceptionally good mechanic. He was a craftsman in the trade, and known to be. He was an exceptionally good repairman, or what we call a refrigeration man. He handled HDAC type problems, which is hard to come by. They're scarce as hen's teeth. He was also an expert on oil and gas burners, as good as anybody, as good as there is in the industry.

James E. Geiger, a consulting engineer, testified that he supervised the moving of the heater in question to his office several days after the accident. He found nothing wrong with the electrical apparatus on the heater when he tested it. He stated he was present when Charles Kock, a chemical engineer hired by the defendant to test the heater, lit the pilot light of the heater and then the main burner. Mr. Geiger testified the heater was in his possession in his garage until it was taken away to be tested by Dr. Harvey Joe Wilkerson, the expert witness of the plaintiff.

Mr. Kock testified that he examined the building where the accident occurred and then tested the heater. This was done on November 7 and 8, 1974, several weeks after Mr. Grissom was burned. He said the heater was set up and gas was supplied to it. The lines were bled a little so that gas would be at the pilot light. The pilot light was lit and the heater was operating in a normal manner. The pilot light was extinguished and relit again. Mr. Kock found the heater to be in proper working order and found nothing wrong with the heater.

Dr. Harvey Joe Wilkerson, the plaintiffs' expert, testified that he picked up the heater on October 16, 1976, from Mr. Geiger's place of business. He said he ran a leak test on it and found no abnormal leakages. He attempted to light the pilot light more than fifteen times; he could light it but it would not continue to burn as the pilot light would go out. This testing was done on October 20, 1976.

On November 8, 1976, Dr. Wilkerson again checked the pilot light operation, but was unsuccessful in getting it to function properly. On November 20, 1976, with representatives of all parties present, Dr. Wilkerson again tried unsuccessfully to light the pilot light. On this date it did not light at all. After this he disconnected the pilot gas supply line, and by blowing on it was able to clear the line sufficiently so the pilot would light. The pilot would then light, but as before went out when it was switched to the "on" position. Dr. Wilkerson then disassembled the line leading from the flow control valve to the pilot light and also the pilot orifice which is located in this area. He found particles on the downstream side of the lines and it appeared that the particles were plugging the two orifice holes. Some of the particles were magnetic and some were not. Dr. Wilkerson said he found no particles on the upstream side. It was Dr. Wilkerson's opinion that the particles were present before the gas supply came through the lines. It was also his opinion that the particles were present in the heater when the heater left the manufacturer approximately three years before he made these tests.

Mr. Ray Qualley then cleaned the orifice at the request of Dr. Wilkerson. Mr. Qualley wiped it and blew through it which was the main method of cleaning it. The heater was then put back together and operated satisfactorily.

After these tests were made by Dr. Wilkerson in Knoxville, he went in February, 1977, to the defendant's plant in Virginia where the heater was manufactured and assembled. He observed that the work table at which the orifices for propane gas were assembled had numerous metal particles on the table and in the entire area. Dr. Wilkerson was asked if the particles found at defendant's plant where the pilot orifice subassembly is done were of the same type as he had found within the heater with which we are concerned in this case. He replied: "There were similarities in the particles. I can't say that they were exactly

the same particles, but there were similarities in the particles." It was his belief that the particles found in the orifice of the pilot light were present in the heater when it left the hands of the defendant.

Dr. Wilkerson's opinion as to what caused the fire which ultimately killed Mr. Grissom was: "There was a . . . as the witnesses that were present described it, there was a considerable amount of gas in the area around the heater. This was not a very small . . . this was not a minute quantity of gas, this was enough gas that it enveloped Mr. Grissom, and in my opinion that gas resulted from Mr. Grissom's effort to light the pilot, and probably his bleeding of the lines to insure that the lines that were supplying the propane gas were purged of air, and that propane was being supplied."

Under cross examination by defendant's counsel, Dr. Wilkerson testified that he was called into the case almost two years after the accident and picked up the heater at Mr. Geiger's garage. The garage was not completely enclosed nor was it kept locked. The heater was stored with other equipment and without a protective covering around it.

Dr. Wilkerson was asked by defendant's counsel: "Now, do I understand your assumption would be that the quantity of gas that was present in this room got there by Mr. Grissom opening the main service line, a line that's not a part of Modine's heater?" Dr. Wilkerson answered: "My evaluation of the information provided me by the statements of the witnesses and the pictures, leads me to the conclusion that there was more gas available for combustion around this heater that would have been provided by bleeding it through the pilot line intact. Now, it is possible if one disconnects this line, it has this opening here, and depresses the valve sufficiently long to bleed in a quantity of gas, but in the normal gas supply line, if all lines were intact, my opinion is there was too much gas in the area to have either been . . . to have come into the area by the pilot mechanism connected properly." To the question that he

really didn't know how the gas got in the room, he replied, "No, I do not."

In *Kerley v. Stanley Works*, 553 S.W.2d 80 (Tenn.App.1977), a workman was electrocuted while using an electric drill, and the widow sued, among others, the manufacturer alleging a defect in the drill. After the accident an examination of the drill revealed a ground wire in the drill cord was broken. However, the court found no proof on how it was broken or that it was broken at the time it left the manufacturer. Although it is clear that our Tennessee courts have adopted the doctrine of strict liability upon manufacturers as set out in 2 Restatement (2d) Torts, # 402A, *Kerley* quoted *Ford Motor Company v. Lonon*, 217 Tenn. 400, 398 S.W.2d 240 (1966), where it was said:

It should be noted that the above section requires the plaintiff to establish that the product, when it left the hands of the manufacturer or other supplier, was at that time in both a defective and an unreasonably dangerous condition.

In the case at bar the only condition even resembling a defect in the heater that was found by the plaintiff was minute metallic and nonmetallic particles in the pilot light orifice. But as there was no gas escaping from the pilot light orifice, this could not have caused the escape of gas which caused the fatal accident.

Even if the particles found in the pilot light orifice could have been proven to have caused the accident, we find no proof that the particles were placed in there when the heater was manufactured and put together at the defendant's plant.

When the plaintiff's expert took the heater apart and found the particles, two years had elapsed since the accident and three years since the heater had left the defendant's plant. In the two years since the accident, the heater had been stored in a room that was not fully enclosed and with other machinery.

This court is of the opinion that there was no material credible evidence for the jury to base its verdict for the plaintiff.

We find no proof that the heater was defective; that the particles in the heater, if they were there at the time of the accident, caused the explosion; that the particles found two years after the accident by plaintiff's expert were in the pilot light orifice when the heater left the plant, three years prior to the test.

Therefore, the judgment of the lower court is reversed and dismissed. The costs in the cause are adjudged against the plaintiff.

PARROTT, P. J., and GODDARD, J., concur.