Amy N. PRIVETTE, widow of Brandon Wade Privette, Deceased, and mother of natural guardian Tyler Privette, Plaintiff–Appellant,

v.

CSX TRANSPORTATION, INC. Defendant–Appellee.

No. 02–5312.

United States Court of Appeals, Sixth Circuit.

Nov. 4, 2003.

David E. Harrison, Grant, Konvalinka & Harrison, Chattanooga, TN, for Plaintiff–Appellant.

Gareth S. Aden, Christopher W. Cardwell, Gullett, Sanford, Robinson & Martin, Nashville, TN, for Defendant–Appellee.

Before NORRIS, BATCHELDER, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge.

In the winter of 1998, Brandon Privette ("Privette") suffered a fatal accident during his employ with Franklin Industries, Inc. ("Franklin"). While engaged in the process of using a front end loader to ease a railcar off a scale, Privette unsuccessfully attempted to remove a cable from a moving railcar. The momentum from the moving car pulled the front end loader toward the car and crushed him. His widow sued CSX Transportation, Inc. ("CSXT"), the lessor of the railcars that Privette was working with at the time of the accident, asserting claims for product liability, negligent failure to warn, negligent entrustment, and ordinary negligence. The district court granted CSXT's motion for summary judgment, ruling that as a matter of law CSXT was not liable for leasing cars that could be pulled as they were by Franklin employees. On plaintiff's appeal, we affirm the judgment of the district court.

**Facts**

Franklin is a privately owned company that operates eleven mining plants around the United States, including a limestone mining plant in Anderson, Tennessee, which Franklin has owned since 1988. Franklin transports about half of the limestone it mines at its Anderson plant via railway, loading the limestone into railcars owned by CSXT. The cars are then picked up by CSXT, which transports them to the desired destination on Franklin's behalf. To effectuate this shipping, CSXT leaves its cars on a sidetrack next to Franklin's mine; CSXT retrieves the cars from the sidetrack when they are ready.

The rights and responsibilities governing this sidetrack are covered by a "Private Sidetrack Agreement" that Franklin and CSXT entered into in 1992. The Agreement provides that CSXT owns the initial 93.5 feet at each end of the sidetrack, and Franklin owns the 2,131 feet in the middle. Each party is responsible to maintain the section it owns, and CSXT has the right, but not the duty, to inspect Franklin's section. Regarding liability for accidents involving railcars, the Agreement provides that when CSXT puts a car on Franklin's segment, CSXT's liability ceases and Franklin is thereafter liable, until CSXT resumes control over the car and pulls it back onto CSXT's track.

In preparing the cars for shipping, Franklin loads each car with a quantity of limestone that falls within certain weight parameters. To determine a car's weight, it puts each car on a scale located on the sidetrack. After a car has been weighed, utility workers move it off the scales,

where it rolls freely and slowly down a gentle incline until it connects with the other cars. Getting the cars to roll onto and off of the scale is a substantial task, however, since the loaded cars can weigh 125 tons or more. Franklin has used various methods to move the railcars off the scales. Until about a month before the accident in the present case, Franklin was pushing the cars with a front loader tractor, but this was damaging CSXT's cars, and Franklin abandoned the practice after CSXT complained and sent Franklin a bill for the repairs. In discussing the car damage, CSXT's representative told a Franklin officer that CSXT's own method of moving cars was to use a trackmobile, a vehicle designed specifically for this purpose. But CSXT's representative did not offer any other suggestions, nor did Franklin's officer ask for any. Franklin—which had been moving railcars at its various plants for over 10 years—had previously considered trackmobiles but found that they worked poorly for its purposes, and instead it used other methods, like attaching a knuckle—a device that would attach to the bucket to prevent the bucket from directly pushing or pulling the railcar—to a front end loader.

On this occasion, the Anderson plant used what was known as the "cable method," in which a ten-foot cable was attached at one end to the bucket of a front end loader, and at the other end to an O-ring located near the lower corners of CSXT's railcars. (Some of CSXT's cars had a sign above the O-ring, reading, "Pull Here."[1]) To pull a car off the scales, the front end loader would drive in reverse, parallel to the track, pulling the car until it began to roll very slowly down the incline. The cable would then slacken as the O-ring

neared the bucket of the front end loader. Franklin had trained its utility workers how to step in at this point and pull the hook off the O-ring while there was slack in the cable, being careful not to get in between the loader and the car. This last point was important because unless the front end loader kept moving in reverse next to the car, after the O-ring had passed the bucket the cable would tighten and the bucket of the loader would be dragged sideways into the railcar as it pulled the car to a stop. According to Franklin's instructions, if the utility worker could not pull the hook off before it passed the bucket, he should not move between the loader and the bucket, but should step back and let the loader stop the car. The loader would then reposition the car for another try.

The incident in this case happened on December 23, 1998, a cold and wet day at the Anderson plant. Brandon Privette, plaintiff's husband, was working as a utility man, unhooking the cable from cars after they were pulled off the scales by the front end loader, which was driven by Thomas Guess, another Franklin employee. Both Privette and Guess had been trained in the cable method, and both had used the method on the job previously. On this occasion, Privette was unable to get the hook off one of the cars, so he stepped back and let the loader stop it. On the second try, still unable to pull the hook free, he followed it as the O-ring moved past the bucket. When the cable came taut, it pulled the bucket of the front end loader towards the railcar and into Privette, crushing his chest and killing him.

The accident was investigated by the Mine Safety and Health Administration

1. The O-rings were apparently designed to allow a railcar body to be lifted off of or onto a different railcar frame and wheels. The O-rings are attached at a reinforced part of the railcar body and lifting a railcar elsewhere could damage it. *See* J.A. at 921; Plaintiff Br. at 11.

("MSHA"), which concluded that "[t]he accident was caused by moving the rail cars with equipment not designed to be used for this purpose"—that is, Franklin's front end loader was not intended to be fitted with a cable or used in this fashion. In the words of the MSHA report, "[t]his modification and use was beyond the design capacity intended by the manufacturer [of the front end loader] demonstrating a lack of reasonable care which constitutes more than ordinary negligence and is an unwarrantable failure to comply with a mandatory safety standard." J.A. at 227. Prior to the accident, however, the MSHA had apparently witnessed Franklin employees using the cable method, without commenting on the practice or citing Franklin with a violation.

Mrs. Privette subsequently filed this suit against Franklin and CSXT in Tennessee state court, on behalf of herself and her child, Tyler. CSXT removed the action based upon diversity of citizenship after Mrs. Privette voluntarily released Franklin from the suit. Mrs. Privette subsequently amended her complaint twice, raising a number of tort claims against CSXT. The district court granted summary judgment to CSXT, and Mrs. Privette now appeals.

## Analysis

This Court reviews *de novo* the district court's order granting summary judgment. *Bush v. Dictaphone Corp.*, 161 F.3d 363,

367 (6th Cir.1998). Viewing all of the evidence in the light most favorable to Mrs. Privette as the non-moving party, this Court may affirm only if there is no genuine issue of material fact and CSXT is entitled to judgment as a matter of law. *Id.* at 368.

Since this is a diversity case, the substantive law of Tennessee as interpreted by the Tennessee Supreme Court governs, and our goal is to predict how Tennessee courts would resolve this case. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Hines v. Joy Mfg. Co.*, 850 F.2d 1146, 1150 (6th Cir. 1988).

## I. Products Liability

Plaintiff argues that CSXT should be strictly liable under the Tennessee Products Liability Act of 1978 ("Act"), Tenn. Code Ann. § 29–28–101 through § 108. We affirm the grant of summary judgment to CSXT because there are no genuine issues of material fact, and CSXT is entitled to judgment as a matter of law.

The Act provides that "[a] manufacturer or seller of a product shall not be liable for any injury to a person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller." TENN.CODE ANN. § 29–28–105(a). As the statute directs, a plaintiff can recover for either a defective product or an unreasonably dangerous product.[2] *See Ray ex. rel.*

---

2. Tennessee courts have not yet clarified what the difference between these two tests is. *See, e.g.,* Chad E. Wallace and Andrew T. Wampler, Comment, *Skimming the Trout from the Milk: Using Circumstantial Evidence to Prove Product Defects under the Restatement (Third) of Torts: Products Liability Section 3, Tennessee and Beyond,* 68 TENN. L. REV. 647, 666 (2001) ("[T]hus far the [Tennessee] courts have not explained how proof of defective condition differs from proof either of consumer expectations or of risk-utility."). One read-

ing might be that a product could be defective without being dangerous. On the other hand, the Tennessee Court of Appeals has suggested that dangerousness is always a prerequisite. *See Reece v. Lowe's of Boone, Inc.,* 754 S.W.2d 67, 69 (Tenn.Ct.App.1988) (quoting, favorably, this from an article by Dean Wade: "whether the suit is based on negligence, or breach of implied warranty, or on strict liability, the product must be found to be unsafe—dangerous by some measure—in order to be action-

*Holman v. BIC Corp.*, 925 S.W.2d 527, 529 n. 3 (Tenn.1996) ("Clearly, the current Act allows recovery for injuries caused by either a product in a 'defective condition' or an 'unreasonably dangerous' product.").

Further, under the unreasonably dangerous product heading there are two types of claims: those based on "the consumer expectation test" and those based on "the prudent manufacturer test." *See Jackson v. Gen. Motors Corp.*, 60 S.W.3d 800, 806 (Tenn.2001); *BIC Corp.*, 925 S.W.2d at 530. Both tests are based on portions of the Act's definition of "unreasonably dangerous":

> "Unreasonably dangerous" means [1] that a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or [2] that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition.

TENN.CODE ANN. § 29–28–102(8) (brackets added). The consumer expectation test is based on the first part of this provision; the prudent manufacturer test is based on the second. *See BIC Corp.*, 925 S.W.2d at 529–30.

Mrs. Privette seeks to recover in strict liability under all of these headings, arguing that CSXT's mislabeling and failure to warn about its O-rings rendered the railway cars defective and unreasonably dangerous, in the latter case because they violated both the consumer expectation and prudent manufacturer tests.[3]

## A. Defective Condition

■ As the plaintiff has not presented any evidence that CSXT provided Franklin with a product in a defective condition, her claim cannot succeed. The Act provides that a product is in a "defective condition" when its condition "renders it unsafe for normal or anticipatable handling or consumption." TENN.CODE ANN. § 29–28–102(2). A plaintiff claiming a defective condition can meet her burden through various means, including "the testimony of an expert who has examined the product or who offers an opinion on the product's design." *Browder v. Pettigrew*, 541 S.W.2d 402, 406 (Tenn.1976) (quoting *Scanlon v. Gen. Motors Corp.*, 65 N.J. 582, 326 A.2d 673, 678 (1974)); *see also Roysdon v. R.J. Reynolds Tobacco Co.*, 849 F.2d 230, 236 (6th Cir.1988) (noting that since the Act refers to "anticipatable" handling or consumption, "consumer knowledge about the risks inherent in the use of a product is one factor to be considered when determining if a product is defective").

Plaintiff argues that the CSXT's railcars were defective—unsafe for normal or anticipatable handling—because (1) pulling railcars from the side is extremely hazardous, and the sign "Pull Here" found above the O-rings on some of CSXT's railcars encouraged users to pull the cars in that fashion, and (2) despite the hazards of pulling railcars from the side and the like-

---

able."); *Gerdts v. Nelson*, 1995 Tenn.App. LEXIS 219, at *6, 1995 WL 146232 (Tenn. Ct.App. April 4, 1995) (reiterating this rule).

**3.** A seller for purposes of product liability has been defined to include a lessor. TENN CODE ANN. § 29–28–102(7); *Baker v. Promark Products West, Inc.*, 692 S.W.2d 844 (Tenn.1985). Further, CSXT appears to concede that it is a "manufacturer or seller" under the Act, and it does not argue that it should be granted the exemption under Tenn.Code. Ann. § 29–28–106(b), which prohibits actions against sellers in certain circumstances. Consequently, we assume that Mrs. Privette has established that CSXT may be found liable if the other requirements for product liability actions are met.

lihood of such activity given the O-rings and the "Pull Here" signs, CSXT failed to supply Franklin either with instructions about how to use the O-rings safely or with safety warnings.[4] *See* J.A. at 501–02 (Mrs. Privette's amended complaint). In support of these claims, she submitted an affidavit from an expert, Russell Marhefka. He attested, first, that CSXT should have known that users would assume that it was safe to pull its railcars from the side because the O-rings and the "Pull Here" signs encouraged the practice, and because prior to Mr. Privette's death the MSHA had seen Franklin employees using the cable method but had done nothing. J.A. at 438. Second, he believed that CSXT could easily have remedied the defect by removing the O-rings or the "Pull Here" signs. Third, he opined that CSXT had failed to instruct and warn Franklin and its employees about the hazards of the cable method. Fourth, he averred that the dangerousness was not eliminated by Franklin's rule that employees should not step between the railcar and the bucket, because of the wet and muddy conditions under which the employees sometimes had to work, and because the employees had little time to grab and remove the hook.

Nevertheless, the plaintiff's defective condition claim fails because she has not been able to show that CSXT provided Franklin with a product that was unsafe for normal or anticipatable use. TENN. CODE ANN. § 29–28–102(2). Franklin's cable method was not the normal or antici-

patable use of the O-rings; it was simply too risky and that risk was shared by the employees. Mrs. Privette presents evidence that the employees assumed the method was safe because it had been employed for many years and the MSHA had not stopped the practice. Furthermore, she asserts that the "Pull Here" signs would authorize the side pulling of the railcar by front end loaders. It is true that the signs may indicate that the cars could be pulled by the O-rings, but not necessarily from the side with a front end loader. Franklin's employees were all aware of the risk posed by standing between the front loader and the railcar while removing the cable. The Franklin supervisors emphasized the need for safety in this practice. Indeed, even the deceased followed Franklin's instructions to move out of the way if the cable could not easily be removed on the first try shortly before his unfortunate accident.

Mrs. Privette's claim is similar to lawsuits in which plaintiffs sue alcohol manufacturers because of the health effects associated with drinking. Alcohol is not defective due to the present health risks associated with it unless the alcohol is not manufactured properly or contains dangerous impurities not associated with drinking. *Pemberton v. Am. Distilled Spirits Co.*, 664 S.W.2d 690, 692 (Tenn. 1984) (holding that the grain alcohol is not a defective product and there was no need to warn about the dangers of the

---

4. It is unclear whether the railcar that Mr. Privette was crushed against had a "Pull Here" sign. According to the district court, "there is no evidence that the railway car involved in Mr. Privette's death had the 'Pull Here' signage[.]" J.A. at 1029. But Mrs. Privette had filed a motion to compel CSXT to produce information that may have answered this question. *See* J.A. at 349 (her motion to compel, arguing that "CSXT failed to state whether it maintained any records that would identify those CSXT railcars which were sup-

plied to or picked up from Franklin for the time period from December 1, 1998 through December 31, 1998"). The district court granted summary judgment without addressing the motion to compel, though, and Mrs. Privette now argues that this was erroneous and prejudicial, because the district court noted that she had failed to establish this fact, and it may have relied in part on this finding in its holding. *See* Plaintiff Br. at 27 n. 2 and 31 n. 3.

alcohol because the danger of alcohol poisoning is well known by the public). Likewise, a knife is not defective simply because if the user's hand slips, the blade will cut his or her hand. In the present case, the fact that there are O-rings on the sides of the railcars and some have "Pull Here" signs and CSXT did not inform the employees of the proper use of the O-rings, does not make the railcars defective because of the use (or misuse) that Franklin's employee's engaged in.

In this case the testimony of Mr. Marhefka does not provide the plaintiff with sufficient evidence to avoid summary judgment. In *Reece v. Lowe's of Boone, Inc.,* one child was killed and another was seriously injured when the go-kart they were riding on the street passed through an intersection in which weeds obscured the vision of the go-kart driver as well as the automobile driver who proceeded to strike the go-kart. 754 S.W.2d 67, 68 (Tenn.Ct. App.1988). The plaintiffs did not claim that the go-kart had any mechanical defects, but instead they hired an expert who testified that the go-kart could have been made safer if the go-kart was equipped with a six foot safety flag. *Id.* at 68, 70. The Tennessee Court of Appeals granted the defendant go-kart manufacturer's motion for summary judgment and noted "[w]e believe without question that the low profile of the go-kart would be obvious to the ordinary consumer, who should be expected to operate the go-kart in a manner to compensate for this limitation." *Id.* at 71. The court was "mindful" of the expert's testimony but stated that the expert's "conclusions are based upon what is obvious to an ordinary consumer which would not render a product otherwise structurally sound 'defective' or 'unreasonably dangerous.'" *Id.* at 71–72.

Marhefka's testimony leads us to a similar conclusion in this case. Marhefka's testimony is based on what was obvious to everyone—that the cable method was dangerous. This obvious danger does not make the railcars defective. Tennessee courts have repeatedly noted that "manufacturers are not insurers," and the design does not have to be perfect. *Gerdts v. Nelson,* 1995 WL 146232, at \*2–\*3, (Tenn. Ct.App. Apr.4, 1995); *Kerley v. Stanley Works,* 553 S.W.2d 80, 84 (Tenn.Ct.App. 1977). Perhaps Privette's death could have been avoided if the signage had been absent or different, but as a matter of law the obviousness of the danger posed by the cable method mandates the conclusion that the railcars were not in a defective condition.

**B. Unreasonably Dangerous**

**1. Danger Apparent to the Ordinary User**

■ Given the apparent danger of using the O-ring to employ the cable method, the plaintiff has failed to show that CSXT's railcars were unreasonably dangerous under either the consumer expectation or the prudent manufacturer test. Under the Act, "[a] product is not unreasonably dangerous because of a failure to adequately warn of a danger or hazard that is apparent to the ordinary user." TENN. ANN.CODE § 29–28–105(d). In this case, the danger of pulling cars via the cable method was apparent to the ordinary users—the utility men and front loader drivers who performed the job—and hence Mrs. Privette's products liability claims must fail, insofar as they rely on the failure to warn.

There is no indication that anyone was unclear about what would happen if a utility man was caught between the loader and the 100–ton railway car the loader was pulling when the car rolled past the bucket and the cable went taut. This was evident, for example, from the deposition testimony of Guess, the driver of the loader that killed Privette. When asked whether he

had braked the loader while Privette was groping for the hook, he said he had not, because he knew Privette was between him and the railway car, and because, in his words, "I know what happens when you stop." J.A. at 250. Everyone else did too. Hence, as Guess observed, "[e]verybody complained about that steel cable," J.A. at 241, and hence Franklin's instruction that if the utility man could not unhook the cable, he was to step back and was *not* to step between the bucket and the railcar.

The fact that some of CSXT's cars said "Pull Here" above the O-ring does not change this result. Though the signs indicated that the cars could be pulled using the O-rings, it was nevertheless apparent to ordinary users that when the cars were pulled by a front end loader on a downhill incline, it was dangerous to get between the loader and the railcar.

Mrs. Privette argues that "[t]he 'open and obvious' defense to a products liability action under Tennessee law has been absorbed into the doctrine of comparative fault." She cites for this proposition the landowner liability case of *Coln v. City of Savannah*, 966 S.W.2d 34 (Tenn.1998), in which the Tennessee Supreme Court held that "an open and obvious danger does not automatically result in a finding of no duty and therefore no landowner liability." *Id.* at 37. But the Tennessee courts have not extended *Coln* to the products liability area, nor does it appear that they would likely do so. In landowner liability cases, the "automatic" absence of a duty for "open and obvious" dangers led to results inconsistent with the policies underlying comparative fault. Sometimes a landowner is at fault for creating an open and obvious danger. It does not follow that a product is "unreasonably dangerous" when the danger is actually apparent to the user. Tennessee's explicit statutory retention of a defense for apparent danger to

the ordinary user in failure to warn cases supports this distinction.

Mrs. Privette additionally argues that the "deliberate encounter" exception to the "open and obvious danger" doctrine applies here. In states that have adopted the exception, landowners are not relieved of liability for open and obvious dangers where, for example, the danger is at the employee's job premises, and the employee will lose his job if he refuses to encounter the danger. *See, e.g., Lafever v. Kemlite Co.*, 185 Ill.2d 380, 235 Ill.Dec. 886, 706 N.E.2d 441, 449 (1998). But here again we see no evidence that Tennessee would apply such a rule, particularly in a products liability case.

The Tennessee statutory provision concerning open and obvious dangers only applies explicitly to failure to warn claims. *See* TENN.CODE ANN. § 29–28–105(d). The plaintiff's consumer expectation test claim is based on the failure to instruct and the failure to warn, so only the former remains viable. *See* J.A. at 502 (Mrs. Privette's complaint, stating that the railcars were unsafe for ordinary use "because if an O–Ring is provided on the side of a railcar with a sign above it which reads, 'Pull Here,' *without further instructions or warnings,* the ordinary user of CSXT railcars would expect that the railcar may be safely pulled from the side." (emphasis added)). Her prudent manufacturer test claim is based on four grounds: failing to correct physical defects in the O-ring, failing to give adequate instructions regarding how to use the O-ring, failing to adequately warn of the hazards, and failing to either remove the "Pull Here" signs or to change them to "Lift Here." *See id.;* Plaintiff Br. at 34. Consequently, only the first, second, and fourth grounds of this claim remain at issue, and since she appears to have abandoned her first ground, for physical defects, only the second and

fourth grounds remain. We address in turn those aspects of plaintiff's consumer expectation and prudent manufacturer claims that do not involve the failure to warn.

## 2. The Consumer Expectation Test

■ Plaintiff's claim under the consumer expectations test fails because the consumers could not have expected the product to be safer than it was. To establish liability under the consumer expectation test, a plaintiff bears the burden of providing sufficient evidence to "create a question of fact that the product was 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'" *Jackson*, 60 S.W.3d at 805 (quoting TENN.CODE ANN. § 29–28–102(8)); *see also id.* at 804 ("[I]n order to be successful under the consumer expectation test, the plaintiff must present evidence that the ordinary consumer has an expectation regarding the safety of the product."). If the plaintiff meets her burden, the task falls to the finder of fact to "employ its own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence." *Id.* at 805–06 (quoting *Arnold v. Dow Chem. Co.*, 91 Cal. App.4th 698, 717, 110 Cal.Rptr.2d 722 (2001)). "The law requires manufacturers to warn of hidden and unknown dangers in their product; however, as to some risks, manufacturers are entitled to rely upon the common sense and good judgment of consumers." *Pemberton*, 664 S.W.2d at 693 (Tenn.1984) (quoting *Pemberton v. Am. Distilled Spirits Co.*, 1982 Prod. Liab. Rep. (CCH) ¶ 9520 (Tenn.Ct.App. Oct. 2, 1982) (Franks, J., dissenting)).

Plaintiff posits that utility workers like her husband constitute the "ordinary consumer" of CSXT's railcars and argues that absent an instruction, the O-rings plus the "Pull Here" signs on CSXT's railcars would lead utility workers to believe that the cable method was reasonably safe. Hence, the railcars were dangerous to an extent that would be contemplated by utility workers. To give her claim factual support, she contends that Guess said the "Pull Here" sign led him to believe that pulling the cars was safe. *See* Plaintiff Br. at 32–33. But his testimony in the record does not really support that conclusion; the context indicates that he meant that it was safe for someone in the front loader or that it was safe for the railcars. *See* J.A. at 240–41. She further notes that the Franklin employee who trained Mr. Privette and Guess in the cable method testified that he assumed the O-rings were for pulling cars, *see* J.A. at 546, and her expert Marhefka stated that based on the "Pull Here" signs, "[t]he ordinary user of CSXT railcars would have expected that the railcars could be safely pulled from the side, which rendered the railcars unsafe and unfit for ordinary use," J.A. at 438. These problems would have been solved, in the plaintiff's view, if CSXT had given "appropriate instructions to Franklin and its employees regarding the safe and proper manner to move railcars." J.A. at 438 (Marhefka's affidavit).

Nevertheless, the plaintiff has failed to meet her burden. For a product to be defective under the consumer expectations test, the plaintiff must prove that "the product is more dangerous than a reasonable consumer would have expected." *Tatum v. Cordis Corp.*, 758 F.Supp. 457, 461 (M.D.Tenn.1991). Federal courts applying this standard under Tennessee law have held that "[u]nder this test, a product is not unreasonably dangerous if the ordinary consumer would appreciate the condition of the product and the risk of injury. Hence, summary judgment is proper if the undisputed evidence demonstrates that 'the danger is obvious to the ordinary con-

sumer.'" *Coffey v. Dowley Mfg., Inc.*, 187 F.Supp.2d 958 (M.D.Tenn.2002) (quoting *Curtis Through Curtis v. Universal Match Corp.*, 778 F.Supp. 1421, 1427 (E.D.Tenn. 1991)).

Mrs. Privette has not presented any evidence to suggest that the utility workers at Franklin did not recognize the danger of stepping between the 100–ton railcar and the front end loader. Any "ordinary consumer" would recognize that this action was a plain and obvious danger of the cable method. Neither CSXT nor the condition of the cars, with the O-rings and/or the "Pull Here" signs, created or endorsed the cable method; instead, the tragedy was caused by that grossly unsafe method that Franklin employed at this one particular plant. CSXT in delivering the railcars in this condition did not give Franklin a product with a hidden danger that the ordinary user would not have perceived.

### 3. The Prudent Manufacturer Test

■ Plaintiff's claim under the prudent manufacturer test also fails. To prevail under the prudent manufacturer test, a plaintiff must establish that "that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition." TENN. CODE ANN. § 29–28–102(8). In the present case, this means that we impute to CSXT the knowledge that the cable method was dangerous, and ask whether a prudent railcar manufacturer would nevertheless have made cars with O-rings and "Pull Here" signs. *See BIC Corp.*, 925 S.W.2d at 530 ("[T]he prudent manufacturer test imputes knowledge of the condition of the product to the manufacturer. The test is whether, given that knowledge, a prudent manufacturer would market the product." (footnote omitted)). This determination involves a risk-utility analysis, in which a number of factors are considered, includ-

ing "the usefulness and desirability of the product, the safety aspects of the product, the availability of a substitute product which would meet the same need, the manufacturer's ability to eliminate the unsafe character, the user's ability to avoid danger, the user's awareness of the danger, and the feasibility of spreading the loss." *Id.* at 532; (citing John W. Wade, *On The Nature of Strict Tort Liability for Products*, 44 MISS. L.J. 825, 837–38 (1973)); *see also id.* at 533 & n. 10 (providing a more detailed version of this list, and holding that "the prudent manufacturer test set forth in the Tennessee Products Liability Act requires a risk-utility balancing of factors, including those factors identified as part of the Wade–Keeton prudent manufacturer test.").

Mrs. Privette contends that under factor (4), the manufacturers's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility, a prudent manufacturer would not have distributed railcars with O-rings and "Pull Here" signs. CSXT could easily have corrected the defect in its cars by either removing the "Pull Here" signs, or by changing them to "Lift Here." According to Marhefka, such a change would have been feasible and would have significantly reduced the risk of seriously injury or death. J.A. at 438.

In light of the other Wade–Keeton factors, especially those involving the user's awareness and ability to avoid danger, this fails to meet plaintiff's burden. We have already established that CSXT had no obligation to warn Franklin of the dangers of the cable method because they were obvious and easily avoidable. Further, no witness had heard of a similar accident involving the cable method at this Franklin plant, the only plant where this method was apparently utilized. *See Moreland v.*

*Weaver Leather Goods, Inc.*, 13 Fed.Appx. 329, 330, 2001 WL 700822 (6th Cir. June 15, 2001) ("No witness had ever heard of a similar accident involving [the product at issue], despite thousands of such [products] having been sold over a twenty-year period. There was simply no evidence to demonstrate that the [product] failed the prudent manufacturer test, and Tennessee law will not substitute the existence of an injury for proof of a defect." (citation and quotation marks omitted)).

## II. Negligent Failure to Warn and Instruct

■ The plaintiff also fails to make the necessary showing for an independent product liability claim sounding in negligence, based on the failure to warn or instruct. *See* Plaintiff Br. at 39. At the outset we note that, as a "product liability" claim, it is subject to the limits of the Tennessee Product Liability Act. Under the Act,

> "Product liability action" for purposes of this chapter includes all actions brought for or on account of ... death ... caused by or resulting from the ... warning ... of any product. "Product liability action" includes, but is not limited to, all actions based upon the following theories: strict liability in tort; negligence ...

*See* TENN.CODE ANN. § 29–28–102(6). For such claims, the Act's language is exclusive and preemptive: "A manufacturer or seller of a product *shall not be liable for any injury* to a person or property caused by the product *unless....*" *Id.* § 29–28–105

(emphases added). Yet Mrs. Privette bases this claim on Restatement sections 388 (liability of persons supplying chattels to others) and 392 (liability of persons supplying chattels to others for use in business) without explaining how these sections fit under the Act.

In the context of this case, we are unable to attribute broader liability under these Restatement provisions than under the product liability categories already discussed. We find no post-Act cases in which Tennessee courts have applied Restatement § 392.[5] The Tennessee Supreme Court and the Sixth Circuit have allowed plaintiffs to bring § 388 claims since 1978, when the Act was passed, without considering the relation between the Act and the Restatement section 388. *See Whitehead v. Dycho Co.*, 775 S.W.2d 593, 598 (Tenn.1989) (considering a claim based on section 388); *Jacobs v. E.I. du Pont de Nemours & Co.*, 67 F.3d 1219, 1238 (6th Cir.1995) (a Tennessee diversity products liability case, in which the court applied Restatement § 388, noting that both parties agreed that it was the standard that governed whether the defendant had a duty to warn). The relationship between the Tennessee Product Liability Act and § 388 is unclear from these cases, but here, as in *Jacobs*, the defendant does not object to the plaintiff's reliance on Restatement § 388 as precluded by the Act.

Even assuming that the plaintiff's section 388 claim survives our previous discussion of the Act's application in this case,

---

**5.** Restatement § 392 provides:

One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which

and by person for whose use the chattel is supplied
(a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied, or
(b) if he fails to exercise reasonable care to discover its dangerous condition or character, and to inform those whom he should expect to use it.

the claim still fails because the danger was open and obvious.

The Restatement (Second) of Torts § 388 states:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Comment k to section 388 elaborates on what is required of suppliers when the product contains an open and obvious danger. Restatement (Second) of Torts § 388 cmt. k. A supplier will be liable for the failure to warn if "he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved. It is not necessary for the supplier to inform those for whose use the chattel is supplied of a condition which a mere casual looking over will disclose.... " *Id.*

Plaintiff has failed to show that anyone looking at the cable method would not realize the inherent danger. Franklin had warned its employees to move away from the railcar if the cable could not easily be disconnected. Indeed, Privette followed this instruction shortly before the accident. Privette and Franklin understood the ap-

parent danger of the cable method. Thus, the obviousness of the danger defeats the plaintiff's negligent failure to warn and instruct claim under either Restatement § 388 or Tenn.Code. Ann. § 29–28–105(d).

## III. Negligent Entrustment Claim

■ Plaintiff also asserts a negligent entrustment cause of action against CSXT. While Tennessee courts have recognized a claim for negligent entrustment, the plaintiff's claim fails because she has not shown that CSXT knew or should have known that Franklin's employees were not competent to use the cable method safely or that CSXT should have foreseen that providing the railcars with O-rings, some with "Pull Here" signage, would create an unreasonable risk of physical harm to the employees.

Tennessee courts have articulated four elements that must be proven before a plaintiff can recover on the tort of negligent entrustment. The plaintiff must demonstrate: "(1) an entrustment of a chattel, (2) to a person incompetent to use it, (3) with knowledge that the person is incompetent, and (4) that is the proximate cause of injury or damage to another." *Nichols v. Atnip,* 844 S.W.2d 655, 659 (Tenn.Ct.App.1992); *see also Woodson v. Porter Brown Limestone Co.,* 916 S.W.2d 896, 907 (Tenn.1996). The Restatement explains:

One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

Restatement (Second) of Torts § 390 (1965). The focus of the tort of negligent entrustment is "the degree of knowledge the supplier of the chattel has or should have concerning the entrustee's propensity to use the chattel in an improper or dangerous fashion." *Rains v. Bend of the River*, 2003 WL 21766247, at *11 (Tenn.Ct. App. July 31, 2003).

Mrs. Privette contends that CSXT was negligent in entrusting its railroad cars to Franklin because CSXT had actual knowledge of the dangerous methods utilized or was on notice that Franklin's employees had not received proper training regarding the movement of the railcars and that Franklin was using the grossly unsafe cable method for moving railcars. Mrs. Privette provides no evidence upon which a jury could reasonably conclude that Franklin was incompetent to receive and use railcars. CSXT was aware that Franklin owned an operated the limestone plant for many years, and that during the course of that ownership Franklin has used many methods for moving railcars. After the damage to the railcars using the push method was noted, CSXT surmised that the person moving the railcars was new to that position. J.A. at 919. However, § 390 of the Restatement does not impose on CSXT a duty to supervise the training of Franklin's employees under the circumstances of this case. CSXT knew that Franklin is an established company with no apparent prior history of incidents of the type that occurred here, and the record does not support the inference that CSXT either knew or had reason to know that Franklin's employees would use the railcars in a manner involving unreasonable risk of physical harm to themselves or others.

It is true, viewing the evidence in the light most favorable to Mrs. Privette, that at least one employee of CSXT observed Franklin using a cable to move railcars prior to the accident. J.A. at 935. It is unclear from this testimony that the method that this employee observed was the same method used when Mr. Privette was injured. The employee said that Franklin "was pulling the car properly." J.A. at 935. While this incident presumably involved the use of the O-rings to pull the railroad car, it is not clear from the record that the process involved having someone remove a cable while the car was in motion. This is the only evidence that CSXT was aware of Franklin's using the cable technique to pull railcars, and this evidence does not permit the inference that CSXT knew or had reason to know the Franklin was permitting or training its employees to use a technique for removing the cable from the railcars that was unreasonably dangerous. As the plaintiff has not provided more than a scintilla of evidence to establish either the second or third elements of her negligent entrustment claim, that claim cannot withstand summary judgment.

## IV. Ordinary Negligence Claim

■ Plaintiff also asserts that CSXT by not providing Franklin employees with instructions on alternative methods for moving the railcars was negligent in its failure to prevent a risk created when it acted affirmatively by asking Franklin to cease damaging railcars with the front-end loader. She does not, however present enough evidence to support this claim.

CSXT was under no duty to warn Franklin of the potential danger in using the cable method. Common law does recognize that "an actor, by his affirmative acts, can create or assume a duty where none otherwise would have existed." *Myers v. U.S.*, 17 F.3d 890, 901 (6th Cir. 1994) (citing Restatement (Second) of Torts § 321–324A). Specifically, the plaintiff relies upon Restatement § 321 which states:

(1) If the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect.

(2) The rule stated in Subsection (1) applies even though at the time of the act the actor has no reason to believe that it will involve such a risk.

Restatement (Second) of Torts § 321.

Plaintiff has failed to show that CSXT realized or should have realized that asking Franklin to quit damaging its railcars with a front end loader would cause Franklin to employ the cable method. When Franklin inquired about alternate methods for moving the railcars after CSXT asked Franklin to stop using the push method, CSXT did not recommend or condone the cable method; instead, CSXT suggested that Franklin use trackmobiles. In addition, Franklin had previously used a variation of the push method at this plant that did not cause damage to the railcars, and other Franklin plants used alternate methods (apparently this was the only Franklin plant to utilize the cable method). Although Franklin had at times previously used the cable method, CSXT could not have reasonably foreseen that Franklin would switch to the extremely risky cable method of pulling the railcars when there were simpler, safer, and equally cost-effective methods that had been used at other Franklin plants to move the railcars. Therefore, the district court was correct in granting summary judgment on the ordinary negligence claim.

### Conclusion

As we have found no genuine issue of material fact and since CSXT is entitled to a judgment as a matter of law on all counts, we AFFIRM the judgment of the district court.